588 So.2d 1000 (1991)
PATHWAY FINANCIAL, Appellant,
v.
MIAMI INTERNATIONAL REALTY COMPANY, et al., Appellees.
No. 89-47.
District Court of Appeal of Florida, Third District.
September 10, 1991.
Rehearing Denied December 12, 1991.
*1001 Joe N. Unger, Jeffrey C. Roth, Shutts & Bowen and Don A. Lynn, Jonathan Cohen, Miami, for appellant.
Walters & Theis, Anne Baudino Holton, Suzanne S. Ageton, B. Lawrence Theis, Denver, Colo., Fuller, Feingold & Mallah, Laurence Feingold, Allen Fuller, Miami Beach, Holland & Knight and Daniel S. Pearson, Miami, for appellees.
Before COPE, GERSTEN and GODERICH, JJ.
PER CURIAM.
The defendant, Pathway Financial, appeals from a final judgment in favor of plaintiffs in the principal amount of $5,708,000.00 plus prejudgment interest of $1,214,435.43. We affirm in part, reverse in part, and reverse and remand for further proceedings.
In 1980, Chicago-based Crawford Savings & Loan Association, which later became known as Pathway Financial [Pathway or the bank], invested six million dollars to build the Eagle's Nest town house project in Colorado. The project contained forty town houses. The bank financed the sale of several units after a credit verification of the purchaser. A typical unit sold for $190,000.00, of which $40,000.00 was paid in cash and $150,000.00 was a mortgage from the bank. Many of the preconstruction sales fell through and the bank was anxious to find other buyers.
Miami International Realty Company [Miami International], a Miami-based real estate developer, designed a plan to sell time-share units. Miami International and several whole unit purchasers entered into a joint venture agreement. Miami International and the joint venture partners agreed with the bank to purchase condominium units in the project and place these units in a marketing program for the sale of time share interests. The joint venture partners were: Martin Marcus, Saul Rudes, Sidney Rudes, Dr. Jay Oberman, Dr. Burton Langer, David Sloviter, Lance Geismar, Morris Eisen, Martin Rappaport, and George Lax. [Miami International and *1002 the joint venture partners will also be referred to collectively as the plaintiffs.] Thereafter, the joint venture partners purchased the condominium units and obtained financing from the bank. The bank agreed with the whole unit owners and Miami International to restructure the original mortgage loan transactions to accommodate the sale of time-share intervals. This was accomplished by the execution of several documents including the original letter agreement dated April 21, 1981 between the bank and Miami International, the Crested Butte Loan Participation Agreement between the bank and Miami International, the Loan Participation Sale and Trust Agreements, the Joint Venture Agreements and the Loan Modification Agreements. It was the plaintiffs' understanding that the plaintiffs would invest substantial sums of money to put in place and market a time-share program based on the agreement by the bank not to pursue the partners on the promissory notes they had signed for their whole units.
Miami International alleges that it undertook to sell up to fifteen time-share intervals of three or four weeks in each condominium unit. Sale of all fifteen time-share intervals at an average price of $30,000.00 would result in a gross sale of $450,000.00. After payment of the first mortgage, a unit owner could realize a substantial profit. The time-share purchasers made an average down payment of $5,000.00. That left a time-share mortgage of $25,000.00 Upon each sale of a time-share interval, the bank would file a partial release of the mortgage carving out and releasing the lien on the time-share interval weeks which had been sold in order to convey a clean title to the time-share purchaser. Miami International further alleges that the bank and each of the unit owners who made their units available to the time-share plan also executed a Loan Modification Agreement reducing the principal amount of the original note by one-fifteenth of its original face value for each time-share sold. The bank's understanding was that for every time-share interval sold with a $25,000.00 mortgage they would reduce the $150,000.00 debt by 1/15th or by $10,000.00.[1] The bank did not do a credit check on the time-share purchasers because the bank was looking to the unit owners to ultimately pay the debt.[2]
After each time-share unit was sold the time-share purchaser would receive a deed of trust[3] and a partial release of deed of *1003 trust would be issued. The whole unit owners testified that it was their understanding that after every time-share unit was sold the principal amount of the time-share purchaser's mortgage would be deducted from the whole unit owner's mortgage obligation. The whole unit owners thought that there were sufficient time-share in each unit to cover the underlying mortgage and they stopped paying their mortgages. Meanwhile, the time-share purchasers made monthly payments to the bank through a servicing agent in Michigan known as Fidelity Mortgage. Fidelity received the payments, subtracted an administrative fee, and forwarded the balance to the bank. The bank, in turn, was supposed to apply the funds received to the indebtedness on the time-share notes and forward the balance to Miami International as its participation interest.
Despite the agreement, Miami International alleges that it has never received any money from this program. The entire sales program was voluntarily terminated by Miami International because of the adverse publicity caused by the negligence of its attorney to secure the proper licenses and other problems. Pathway alleges that these problems had nothing to do with the bank.
In 1986, the bank began to bring lawsuits against all of the whole unit owners for payment of the underlying mortgages.[4] As a result, the partners and Miami International instituted this action against Pathway to recover all monies they had invested in the program as a result of the bank's failure to honor the terms of the agreement. Specifically, the complaint alleges that Pathway breached its agreement by receiving and misapplying time-share mortgage payments resulting in false and fraudulent mortgage acceleration demands against unit owners and threats of foreclosure against the unit owners. Based on these allegations, the plaintiffs claimed breach of contract, breach of fiduciary duty, fraud, conversion and civil theft.
Pathway filed a general denial to the allegations of the complaint as well as affirmative defenses and a counterclaim for the delinquencies under the time-share interval notes as well as for the unpaid balance plus accrued interest on the unit notes.
In a special interrogatory verdict the jury found that Pathway had breached its contract with plaintiffs, awarding $2,500,000.00 to Miami International and $1,008,000.00 to the partners.[5] The jury also awarded the plaintiffs $250,000.00 on the conversion claim and $250,000.00 on the civil theft claim. The final judgment trebled the civil theft award to $750,000.00 under the applicable statute. The jury found that Pathway had not committed fraud or misrepresentation, but awarded $1,200,000.00 in punitive damages on the claim for tortious conversion to be divided equally among the partners. The jury found against Pathway on all counts of the counterclaim.
Pathway filed a motion for judgment notwithstanding the verdict or for a new trial. The trial court denied the motion and Pathway appeals.
Pathway asserts that there cannot be civil theft and conversion based on one incident since there can only be a single recovery for one alleged act of misconduct. Miami International concedes that the damages awarded for civil theft are duplicative of the conversion award, and that the award of $250,000.00 for civil theft, trebled *1004 to $750,000.00, should be set aside. We agree and hereby reduce the award of damages.
Pathway contends that the trial court erred in failing to direct a verdict for Pathway on Miami International's conversion claim. We agree.
Pathway was accused of receiving monthly payments to which the bank was not entitled and converting these funds to the bank's use in derogation of the plaintiffs' rights. The dispute is based on the mortgages and notes signed by the unit and time-share purchasers which were given to the bank as security and the separate contractual documents executed by the parties. Where the parties are engaged in a contractual dispute over the amount owed and no fraud is involved no civil theft or conversion can occur. Rosen v. Marlin, 486 So.2d 623 (Fla. 3d DCA), rev. denied, 494 So.2d 1151 (Fla. 1986); Douglas v. Braman Porsche Audi, Inc., 451 So.2d 1038 (Fla. 3d DCA 1984). In the instant case, the jury found that Pathway had not committed fraud or misrepresentation on the plaintiffs. Therefore, civil theft or conversion could not have occurred. We find that the trial court erred in not directing a verdict for Pathway and reverse the award of $250,000.00 in damages under the conversion count.
Having reversed the award of compensatory damages for conversion, we must reverse the punitive damage award based on the alleged but unproven conversion. Punitive damages are allowed when the tortfeasor acted with malice, moral turpitude or wantonness. Dr. P. Phillips & Sons v. Kilgore, 152 Fla. 578, 12 So.2d 465 (1943). In the instant case, there is no evidence in the record of Pathway's malice, moral turpitude, wantonness or outrageousness. In fact, the jury found that Pathway committed no fraud or misrepresentation which was a legal cause of the damages to the plaintiffs. Therefore, we find that the trial court erred in not setting aside the jury's award of punitive damages and reverse that award of $1,200,000.00.
We turn next to Pathway's contentions regarding the contract issues. Pathway contends that the trial court erred in failing to set aside the jury determination that Crawford breached its contract with the plaintiffs where this determination is clearly against the manifest weight of the evidence. We disagree. The standard of review to be applied by an appellate court in reviewing a trial court's refusal to set aside a verdict and the denial of a motion for a new trial is whether or not the trial court abused its discretion. Winn-Dixie Stores, Inc. v. Robinson, 472 So.2d 722 (Fla. 1985); Matalon v. Greifman, 509 So.2d 985 (Fla. 3d DCA 1987); Jones v. Airport Rent-A-Car, Inc., 342 So.2d 104 (Fla. 3d DCA 1977). "The discretionary power to grant or deny a motion for a new trial is given to the trial judge because of his direct and superior vantage point." Scandinavian World Cruises (Bahamas), Ltd. v. Cronin, 509 So.2d 1277, 1279 (Fla. 3d DCA 1987) (citing Baptist Memorial Hosp., Inc. v. Bell, 384 So.2d 145 (Fla. 1980)).
In reviewing this type of discretionary act of the trial court, the appellate court should apply the reasonableness test to determine whether the trial judge abused his discretion... . If reasonable men could disagree as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion.
Scandinavian, 509 So.2d at 1279 (citations omitted). Contra Oakes v. Pittsburgh Corning Corp., 546 So.2d 427 (Fla. 3d DCA 1989). The testimony and the documents admitted in evidence over the course of the two-week trial lead us to conclude that the action taken by the trial court was not unreasonable based on this standard.
There is direct conflict in the testimonial evidence as to the obligation of the unit owners under the notes and mortgages given to the bank to secure the purchase price of the whole unit. The plaintiffs' understanding of the agreement with the bank was that each time a time-share interval was sold the total amount of the time-share price, less down payment, was to be credited against the amount of the whole unit *1005 owner's debt to the bank regardless of whether any time-share note was paid. The bank on the other hand claimed that the documents executed established that: (1) the unit owners were guarantors of repayment by time-share borrowers, and (2) the unit owner's obligation to the bank was reduced by one-fifteenth for each time-share unit which was sold. The jury disagreed with the bank's theory of the case and chose to weigh the testimony of the plaintiffs' interpretation of the various agreements as more persuasive. The bank contends that the written agreements were inconsistent with the oral testimony of the trial witnesses and should be weighed in its favor. However, the bank did not object during trial to the admissibility of the parol evidence. See Thal v. Roth, 173 So.2d 174 (Fla. 3d DCA 1965) (party who fails to object to introduction of parol evidence during trial has waived the right to raise this objection on appeal). Therefore, the bank cannot now ask this court to ignore this substantial parol evidence.
Further, the rule in Florida is well established that a written contract may be "modified by an oral agreement if the latter has been accepted and acted upon by the parties in such manner as would work a fraud on either party to refuse to enforce it...." King Partitions & Drywall, Inc. v. Donner Enters., Inc., 464 So.2d 715, 716 (Fla. 4th DCA 1985). A subsequent oral modification between the parties and action in reliance thereon creates a new contractual obligation. Id. Any testimony regarding oral modification does not violate the rule against parol evidence. Id. In the instant case, the testimony and evidence introduced at trial establish that the initial contracts which contemplated the continuing liability of the joint venture partners were modified by subsequent dealings between the parties. The jury was properly instructed on the issue of modification of contract and the bank raises no issue on this appeal with regard to the instruction. For these reasons, we find that the trial court did not abuse its discretion in allowing the jury's determination that the bank breached its contract with the plaintiffs to stand.
Next, Pathway contends that the trial court erred in failing to set aside the jury verdict where the amounts of damages had no rational predicate in the evidence presented. We agree and reverse and remand for a new trial.
The verdict is based on inconsistent measures of damages. Miami International was given back the money it invested and spent on the promotion of the project; these are reliance damages. The whole unit owners were given their lost profits, or benefit of the bargain, based on the finding that the bank failed to share with the whole unit owners the profits owed to them under the loan participation agreements. The jury attempted to award damages to place the plaintiffs in the positions they occupied prior to entering the contract, see Sullivan v. McMillan, 26 Fla. 543, 8 So. 450 (1890); Sundie v. Lindsay, 166 So.2d 152 (Fla. 3d DCA 1964), by returning their original investments to the plaintiffs, and at the same time awarded prospective profits which would have been possible only if the contract would have been fully performed by the bank. See J. Alpert & P. Murphy, Florida Law of Damages § 10-1 (1978). The plaintiffs are not entitled to both reliance and benefit of the bargain damages; these remedies are mutually exclusive and cannot both be the natural result of the breach. See Resorts Int'l, Inc. v. Charter Air Center, Inc., 503 So.2d 1293 (Fla. 3d DCA 1987). Finding that the trial court erred in awarding the plaintiffs damages for both the lost profits and its expenditures made in reliance upon the contract, we reverse the award for breach of contract damages and remand for a new trial on the issue of damages.
As previously stated, we affirm the judgment under review with respect to the bank's liability, finding that the verdict is supported by the evidence. Accordingly, we affirm in part, reverse in part, and reverse and remand for a new trial on the issue of damages.
NOTES
[1] James A. Sawyer explained that paragraph 3 of the letter agreement dated April 21, 1981 and paragraph 5(vi) of the Crested Butte Loan Participation Agreement meant that if the time-share purchaser received a $25,000.00 mortgage, the first $10,000.00 of this indebtedness would be to the bank and the remaining $15,000.00 would be allocated to Miami International. The $10,000.00 was preferential to the bank. He further explained that the whole unit owner remained liable on the underlying mortgage.
[2] The letter agreement dated April 21, 1981, between the bank and Miami International states in pertinent part:

3. At the request of MIAMI, CRAWFORD SAVINGS & LOAN ASSOCIATION shall release from the underlying purchase money mortgage such one-fifteenth (1/15th) UNITS as MIAMI or the Mortgagee or his or her Nominee requests and shall recast the purchase money mortgages on each UNIT in fifteen (15) separate mortgages to reflect and correspond the one-fifteenth (1/15th) time sharing intervals sold and being sold in the UNITS, at the same rate of interest set forth on Page 1 hereof.
Nothing contained in Paragraph 3 hereinabove shall release or be deemed to release the original purchaser of the UNIT from the obligations and payments under the purchase money mortgage.
The Crested Butte Loan Participation Agreement dated January 29, 1982, states in pertinent part:
(vi) Each new Time Interval Mortgage recorded in lieu of the substituted one-fifteenth (1/15th) shall be personally guaranteed to CRAWFORD by the original Mortgagor of the Condominium Unit up to CRAWFORD's percentage of the balance due.
The plaintiffs contend that the later agreement dealt with the same subject matter as the earlier agreement and therefore took the place of the earlier agreement. The Crested Butte Loan Participation Agreement only says that the whole unit owners will personally guarantee up to the bank's percentage of the balance due; it says nothing that the underlying mortgagor will not be released from his obligations on the note.
[3] A deed of trust is an instrument used in some states, including Colorado, that is essentially a security and serves the uses of a mortgage. Black's Law Dictionary 373 (5th ed. 1979).
[4] Ernest Willis, the bank's president, testified that the bank always looked toward the whole unit owners to satisfy the original purchase money mortgages. He admitted that if all the time-share purchasers made their monthly payments that would have generated sufficient money to pay off the existing underlying mortgages. However, if a sufficient number of time-share purchasers would not pay, the underlying mortgage would be kept current.
[5] In effect, each partner was awarded a sum equal to the original purchase price of the town house unit minus the unpaid principal balance as of October 31, 1988. The jury made the following awards: $120,000.00 to Morris Eisen, $120,000.00 to Jay Oberman, $188,000.00 to David Sloviter, $20,000.00 to Saul Rudes, $20,000.00 to Sidney Rudes, $70,000.00 to George Lax, $70,000.00 to Martin Marcus, $120,000.00 to Martin Rappaport, $120,000.00 to Burton Langer and $160,000.00 to Unit 38/Lance Geismar.