SALTER, J.
Del Monte Fresh Produce Company appeals a final judgment exceeding $15.7 million in favor of its telecommunications-cost consultant, Net Results, Inc., following a jury trial. We affirm the jury’s and trial court’s determinations that Del Monte breached the parties’ consulting contract, *669 but we reverse the jury’s $10,000,000 consequential damages award and the prejudgment interest and attorney’s fees and costs subsequently added by the trial court.[1] This is a business damages case in which the computation of Net Results’ “benefit of the bargain” losses requires grade-school arithmetic rather than a “damages model” long on assumptions and short on facts. The jury’s award is neither reasonably certain nor supported by substantial competent evidence.
I. Facts and Procedural History
A. The Consultative Services Agreement
In July 2002, Del Monte and Net Results signed Net Results’ “consultative services agreement” (“Agreement”). Essentially, Net Results agreed to review Del Monte’s local and long distance telephone bills, and its costs for certain data and information technology services, to look for past overcharges and future savings. Any such recoveries of overcharges or savings to Del Monte, including any refunds, rebates, credits, promotional awards, or renegotiated rates, would entitle Net Results to a consulting fee equal to thirty-five percent of the amount recovered or saved. The Agreement was also clear that “if there are no savings, [Net Results] receives no fee.”
The Agreement obligated Net Results to prepare a “Summary Benchmark Proposal,” referred to by the parties as an “SBP,” after researching Del Monte’s teleeommu-nications and information technology contracts and billings.[2] The SBP was to be provided to Del Monte and, if the proposal disclosed cost reductions and savings opportunities above $300 per month, Del Monte had to elect within ten days from receipt whether to (a) terminate the agreement by written notice to Net Results or (b) pay the 35% fee on the credits and savings as invoiced by Net Results each month for the following twelve months. The Agreement also provided that it would automatically renew for a further twelvemonth term on each anniversary of the Agreement unless, at least sixty days before the expiration of an anniversary date, Del Monte cancelled it.
Regarding any “historic savings” that might be achieved by Net Results by, for example, demonstrating to a telecommunications carrier that Del Monte had been overbilled, Net Results was to be entitled to its 35% fee “back at least three years or for the life of any telecommunications agreement, equipment or facilities lease, cellular, paging or data service agreement negotiated by [Del Monte], by [Net Results], or by any other party for [Del Monte].” Finally, the Agreement specified that “[i]f any term is unclear or ambiguous it shall be interpreted to the benefit of [Net Results].”
B. Performance and the SBP
After the parties signed the Agreement, Del Monte executed written authorizations *670 to its telecommunications and data vendors to turn over agreements and billing data to Net Results for research. In November 2002, Net Results provided a one-page memo and two-page attachment to Del Monte’s head of information technology and one of its lawyers. The attachment was the table of contents (with none of the actual findings of fact or conclusions of law) from a 2001 Federal Communications Commission order in favor of AT <& T regarding its complaint that Business Telecom, Inc. (“BTI”), charged consumers excessive “access rates.” Although there was no indication how Del Monte might save money because of such an FCC order, Net Results said in the cover memo:
Attached is one of many Federal Orders which underlay [Net Results’] efforts to recovery unfounded charges by AT & T (for Example) and for others such as Bell South, SBC, and even Equant in the mis-billing of local access charges with long distance on that local bill at dramatically incorrect rates, or even the incorrect re-bill of so many international frame relay circuits.
This is part of the our knowledge template with these carriers and we are using these to force AT & T and the other international carries such as British Telecom, Entel Chile, Telephono Mexico, Brazil’s Telecom, and many more into the USA mandated refunds and redress. This has been missed by Del Monte and AT & T and others for many years and there are apparently as much as $10,000,000 (estimated) of recoveries or credits due to Del Monte.
[All spelling and grammar are as in the original].
The memo went on to estimate that historic refunds and credits due might total $24,700,000 or more, and that prospective annual savings might be $7,600,000. The memo acknowledged that these amounts exceeded a full year of Del Monte’s entire national and international expenditures for the telecommunications services in question,[3] and it noted that additional information and time would be required. The memo does not explain how the 2001 FCC order attached to it (pertaining to BTI’s permissible rates) might produce any savings or refunds to Del Monte, nor does it appear that Del Monte even did business with BTI during the applicable periods.
While the record does not appear to contain an SBP submitted to Del Monte with an identifiable title “Summary Benchmark Proposal,” Net Results maintains that its research was summarized and accepted by Del Monte when Del Monte paid a series of the Net Results invoices.[4] The jury plainly accepted Net Results’ argument on this factual question.
*671 C. Del Monte’s Attempt to Terminate the Agreement
After receiving Net Results’ recommendations and a series of invoices, several of which were paid by Del Monte, Del Monte abruptly decided to terminate the Agreement. In an internal email dated May 14, 2008, a letter purportedly terminating the Agreement before automatic renewal was forwarded to the Del Monte information technology officer who had signed the Agreement in July 2002. As prepared on Del Monte letterhead and as signed by that officer, the letter was backdated to May 1, 2003. At trial, Net Results argued that (a) the letter was fraudulently backdated in a transparent effort to prevent a further automatic one-year renewal of the Agreement[5] and (b) the legal effect of that ineffectual, untimely notice was a repudiation and breach of the Agreement excusing further performance by Net Results.
The jury accepted Net Results’ claim of breach and liability. The trial court denied relief on that aspect of Del Monte’s motion and renewed motion for directed verdict, and subsequently on Del Monte’s motion for a new trial. As a result of the untimely notice, the Agreement was extended through a term ending July 8, 2004. Del Monte became liable for 35% of Del Monte’s savings that were identified, obtained, or could have been identified or obtained by Net Results, during that term (absent Del Monte’s repudiation), less Net Results’ costs of achieving any such results. As to any “historic savings” identified or obtained within that term, the three-year lookback provided a 35% fee to Net Results on rebates, refunds, or savings on covered billings and services back to July 3,1999.
D. Net Results’ “Damages Model”
To establish its damages, Net Results relied on its owner and senior officer, Joseph Chopek. Chopek was accepted as an expert by the trial court over Del Monte’s objection. He described how he had prepared a “model” to demonstrate Net Results’ damages following breach by Del Monte:
I take the data samples that I have, model them against the procedures and analyses formats and proof of concept in the contract, review the contract and attempt to create timelines and information events, statistical events for each of the categories of the contract, and then based on the terms of the contract, make some sort of predictive statistic by sampling the data furnished to me, the contract information furnished by the carriers, which has general outlines of information — bearing in mind, most of those came in years later. And then when we did get the data samples from a handful of the carriers, we used samples from that information to further validate the model.
At various points in his direct examination, Chopek stated or suggested that Del Monte had not provided complete information to him, that he lacked complete information from Del Monte’s telecommunications providers, and that Del Monte had delayed the production of these records and complicated Chopek’s research by including “trucking bills and florist bills and a bunch of other things.” Ultimately these recurring complaints resulted in objections and a motion for mistrial by Del Monte, all of which were denied by the trial court. There is no indication in the record that Del Monte, or any vendor providing services to Del Monte during the pertinent *672 periods, failed to provide bills or payment histories regarding those services during pretrial discovery.[6]
Chopek also stated that Net Results was entitled to “extrapolate” worldwide damages based on Del Monte’s alleged refusal to provide complete evidence of all telecommunications and information technology expenditures. Some of the savings were proven using actual vendor bills and rates, and, as noted, Del Monte paid several of Net Results’ bills for those savings. Other damages claims, however, assumed that Net Results would have been able to negotiate savings with vendors that did not testify, and whose rates to Del Monte did not improve during the remaining contract term following Del Monte’s repudiation of the Agreement.[7] These actual and projected savings were computed by Chopek to total $5,171,262 over the term of the Agreement, and a 35% fee to Net Results on that total would have been $1,723,725.[8] From there, however, Chopek introduced a series of remarkable estimates and a multiplier or “extrapolation” which added over $19,800,000 to that figure.[9]
Chopek admitted that he created estimates for Del Monte’s global accounts for its traffic to and from its United States offices because he concluded that Del Monte had not disclosed information about various vendors and their global billings. Based on those estimates, he computed further savings to Del Monte of $12,294,417 to Del Monte and $4,363,045 as the 35% fee payable to Net Results. Adding this figure to the $1,723,725 in fees calculated for savings he testified were actually produced or could have been produced, he computed total fees payable to Net Results of $6,112,988 for telecommunications to and from Del Monte’s U.S. facilities. But based on a former Del Monte employee’s testimony that the U.S. business relied on only thirty circuits, with *673 about eighty other circuits for its worldwide business, Chopek generously multiplied the $6,112,988 by a 2.7 multiplier to “extrapolate” a fee for the non-U.S. locations of $16,505,068. He testified repeatedly that he was “conservative” in his computations.
E. The Jury Verdict and Posh-Trial Motions
The jury had before it the two-page damages spreadsheet prepared by Chopek to summarize the results of his “model.” The jury found that Del Monte had breached the contract and that Net Results was entitled to $10,000,000 in consequential damages, just under one-half of the $22,618,056 shown on the spreadsheet. There is no apparent connection between the round $10,000,000 award and any of the fees claimed by Net Results for the categories involved in Chopek’s testimony. After Del Monte’s post-trial motions were denied and prejudgment interest was added to the damages, Del Monte commenced this appeal.
II. Analysis
Our review of Net Results’ method for computing damages involves a strictly legal issue and is assessed de novo. RKR Motors, Inc. v. Associated Uniform Rental & Linen Supply, Inc., 995 So.2d 588, 591 (Fla. 3d DCA 2008), review denied, 8 So.3d 1133 (Fla.2009). When the correct methodology has been utilized, however, our review is limited to a determination of whether the damages award is supported by competent substantial evidence.
Florida law and the Restatement (Second) of Contracts[10] are aligned regarding the remedies available following a party’s repudiation of the contract and prevention of performance by the non-breaching party. The non-breaching party, here Net Results, may elect between reliance damages (those costs and expenses of preparing to perform, the recovery of which will place the recipient in the position it occupied before entering into the contract) or lost profits (the benefit of the bargain or “expectation interest”). Pathway Fin. v. Miami Int’l Realty Co., 588 So.2d 1000, 1005 (Fla. 3d DCA 1991). Having elected in this instance to claim lost profits,[11] Net Results can recover only those prospective profits “which would have been possible only if the contract would have been, fully performed by the [non-breaching party].” Id.
In this case, Net Results’ underlying methodology is thus incorrect as a matter of law. As detailed below, Net Results offered no evidence regarding its costs of performing the contract, claiming, in effect, lost gross revenue rather than lost profits. But because the case is remanded for a new trial on damages, we also address the lack of required “reasonable certainty” in Net Results’ attempt to prove its damages at trial. Specifically, Net Results relied upon assumptions and extrapolation for over 90% of its claimed damages, pushing its proof into the realm of conjecture and speculation.
A. “Lost Profits” versus Lost Gross Revenue
This is not a soft tissue tort case in which it may be difficult for the parties or *674 a jury to find yardsticks for the computation of money damages on account of pain and suffering. This was at its core a case about the repudiation and breach of a services contract. The services were rendered (and, post-repudiation, would have been rendered) by identifiable professionals paid by Net Results. Those employees pored over Del Monte’s telecommunications and information technology contracts in a search for overcharges and for future savings. Net Results’ professionals were to draw on their experience to assist Del Monte in renegotiating its telecommunications and information technology contracts at lower rates in order to achieve the savings that would thereby produce revenue to Net Results.
We have continuously held that the computation of damages in such a case requires the non-breaching party to deduct from anticipated contract revenue the costs incurred in performing the contractual services.[12] Typically these include an appropriate allocation of overhead as well as any personnel expenses that would have been incurred. RKR Motors, Inc., 995 So.2d at 593; Marbella Park Homeowners Ass’n, Inc. v. My Lawn Serv., Inc., 12 So.3d 807, 809 (Fla. 3d DCA 2009) (“Here, although the contract price could easily be ascertained, [the non-breaching party] failed to produce evidence of its costs and expenses in performing the five-year contract.”).
In the case at hand, Net Results provided no evidence regarding its overhead, its historical profit margins on such contracts, or the costs of the professionals who worked (and would have been required to continue working, absent Del Monte’s repudiation of the Agreement) on the Del Monte project. Chopek was cross-examined about Net Results’ costs of performing the Agreement:
Q: NRI would have had additional costs, costs of doing business when it performed under the contract for Del Monte — had it performed under the contract for Del Monte?
A: Yes.
Q: Did you take any costs into account in any of your — any costs of NRI doing business into account in doing your damages calculations?
A: The contract doesn’t require me to do that, so the answer is no.
This methodology, unsuccessfully challenged by Del Monte in both the motion for directed verdict and motion for new trial, is invalid as a matter of law and the verdict and judgment based upon it must therefore be reversed.
B. Assumptions and Extrapolation versus Reasonable Certainty
For the benefit of the parties on remand, we also address their contentions regarding the sufficiency of the “damages model” prepared by Chopek for Net Results. Net Results’ “summary calculations” exhibit, totaling $22,618,056 in “Total USA and World” damages, is primarily built upon assumptions and “extrapolation” rather than less ephemeral facts. Although it was apparently an established business with the requisite “track record” to allow proof of a company’s historical profit percentages, Net Results elected instead to focus exclusively on those prospective savings it claimed it would have produced for Del Monte had Net Results been permitted to complete its performance with full cooperation by Del Monte. The result was Chopek’s “model” with assumptions regarding missing vendors and bills, extra circuits assumed to have equal volumes, vendors, and savings, and “extrapolation” to produce damages figures *675 inconsistent with Del Monte’s actual budgets.
Under Florida law, “an inability to establish the amount of lost profits with absolute exactness will not defeat recovery.” Nat’l Papaya Co. v. Domain Indus., Inc., 592 F.2d 813, 818 (5th Cir.1979) (citing Twyman v. Roell, 123 Fla. 2, 166 So. 215 (1936)). However, the countervailing rules require “reasonable certainty” in the proof of those damages and the assumptions underlying them. Id. at 822; see also R.A. Jones & Sons, Inc. v. Holman, 470 So.2d 60 (Fla. 3d DCA 1985). “Damages cannot be based upon speculation or guesswork, but must have some reasonable basis in fact.” Smith v. Austin Dev. Co., 538 So.2d 128, 129 (Fla. 2d DCA 1989).
Applying those principles to the proof of damages in the record at hand, we find no substantiation or reasonable basis in fact for the assumptions made, and “extrapolation” performed by, Chopek on behalf of his company with respect to his “phase two — estimated worldwide” damages in his written “summary calculations.” Those “phase two” estimates comprised, or were the basis for extrapolation for, over 90% of the $22,618,056 total on that exhibit. We also find no record basis upon which to conclude that Net Results was somehow prevented or precluded from obtaining actual telecommunications and information system billings from non-party vendors, allegedly necessitating Chopek’s reliance on estimates and extrapolation. Accordingly, we reverse the verdict and final judgment as to damages.
III. Conclusion
Testimony and documents regarding hypothetical savings on corporate telecommunications services and data transfer are enough to perplex any juror or judge. If the backdated letter attempting to terminate the Agreement is the commercial equivalent of a punch in the nose, it may also seem fair to excuse any rigor in the proof of the resulting damages. But Florida contract law has constraints that were not observed in this case. If Del Monte is accused of hiding vendors, circuit usage, bills, and savings, that is a matter for pretrial discovery and proof rather than for wily use as a repetitive slogan at trial. Allegedly-missing figures are not a warrant to substitute their absence with guesswork.
Proof of damages for breach of this Agreement should not be rocket science. The actual charges for the covered services are susceptible of ready proof by Del Monte’s records and those of its vendors.
The claimed, realizable savings also should be demonstrable, and they should correlate in some reasonable way with the total budget to which the savings apply. The 35% fee on any such savings is simple arithmetic. Notwithstanding this, however, the proof of damages at trial was largely conjecture, and the resulting award by the jury — lost fees of $10,000,000 — translates to purported savings to Del Monte of some $28,571,428 over a term in which its total of annual budgets for the covered services did not approach that amount. Such a result is manifestly excessive.
Net Results’ damages methodology was also reversibly flawed because it failed to prove the other half of the ledger involved in a lost profits case — the expenses that Net Results would have borne to provide the performance excused by the breach.
For these reasons, we affirm the jury verdict, judgment, and post-trial rulings as they relate to Del Monte’s liability for breach; and we reverse and remand the case for a new trial on Net Results’ consequential damages.

. The trial court added approximately $5.7 million in prejudgment interest to the jury's $10 million damages award. Our reversal for a new trial on damages makes it unnecessary to address at this time Del Monte’s argument that prejudgment interest should not have been added to the jury's award. Our reversal of the final judgment includes a reversal of the existing attorney’s fees and costs award, but without prejudice to any award that may be appropriate after the trial on damages is completed.

. The Agreement was limited to enumerated categories of telecommunications, data, and information technology services: local access and long distance telephone service, and "ISP/web or Frame Relay” services (a reference to internet digital transmission technology). The Agreement did not specifically address an upgrade of Del Monte’s frame relay technology to the (then) newer Multi Protocol Listing Services or "MPLS."

. A Net Results exhibit at trial prepared by Del Monte in September 2002 included a twelve-month lookback at Del Monte telecommunications vendors and payments; during that period Del Monte reported 1,307 separate bills from fourteen providers totaling $1,934,206.48.

. In March 2003, Net Results submitted six invoices to Del Monte. Two were for refunds or credits on past bills ("historic savings,” under the Agreement) pertaining to a dispute with its vendor for telecommunications services in Chile, with savings to Del Monte computed at $109,000 and the resultant 35% fee to Net Results at $38,150. Four of the invoices were for prospective annual savings of $371,846 with AT & T for various services. Net Results invoiced for its fee on these projected savings at $10,845.50 per month, or an annual sum equal to 35% of those prospective annual savings. Del Monte paid approximately $60,000 to Net Results for the six invoices prior to its purported termination of the Agreement.

. As noted, cancellation required written notice "at least 60 days before the expiration of one year from the anniversary date” — the anniversary date was July 3, 2003, and sixty days before that was May 4, 2003.

. Ultimately the trial court read a curative instruction to the jury:
There is no evidence or allegation of discovery violation by any party. Any reference to discovery at this time should be considered only in the context of when and how documents were received. There are no allegations of any wrongful conduct by any party during this trial with reference to providing discovery.
Thereafter Chopek again testified repeatedly that Del Monte had not supplied information he had requested. The damages summary provided by Net Results to the jury included captions for "MISSING Global Accounts” and "Evidence Refused.”

. Appellate review of Chopek's computations is impaired by the fact that he relied on his own notebooks of various types of records as the basis for his opinions. The notebooks themselves were not introduced into evidence or authenticated by Del Monte or the vendors whose charges were purportedly amenable to reduction. In addition, savings attributed to a change to a more modern type of transmission service (MPLS) were computed under assumptions, never proven, that (a) all circuits would bear equivalent volume and cost, and (b) higher speed and volume would produce actual budgetary reductions for Del Monte.

. While several of these categories of purported savings- — as an example, an alleged right to refunds of certain federal excise taxes on Del Monte’s bills — rested exclusively on Chopek's testimony and were not corroborated by actual refunds or testimony from a tax attorney or a vendor, the trial court could properly have allowed them to be considered by the jury.

. Chopek's resulting total fee claim for Net Results, $22,618,056, based on a 35%-of-sav-ings fee, would be payable only if Net Results produced $64,623,017 in total Del Monte savings in the enumerated categories of telecommunications and data services. This does not square with a record indicating annual Del Monte expenditures below $2,000,000. Cho-pek maintained that this disparity reflects Del Monte's failure or refusal to identify all its vendors and to supply all billings requested, but again there is no record support for that allegation.

. Sections 347 and 349 address, respectively, compensation for the non-breaching party’s "expectation interest” and "reliance interest.”

. Pro hac vice counsel for Net Results indicated repeatedly that this is "not a lost profits case.” But unless Net Results elects on remand to claim its reliance damages, Florida law requires proof of lost profits (income less expense) rather than merely lost gross revenue.

. See, e.g., Sundie v. Lindsay, 166 So.2d 152, 153 (Fla. 3d DCA 1964).