ROTHENBERG, J.
This consolidated appeal and cross-appeal contests the amount of damages awarded for a breach of contract that led to the constructive eviction and ultimate destruction of Katz Deli of Aventura’s business. Because we agree that prospective lost profits was the correct measure of damages, and find no clear error with the trial court’s factual finding that awarding prospective lost profits beyond the initial lease term would be too speculative, we affirm.

BACKGROUND

The Haibi family owned and operated a successful business, “Katz Deli of New York,” in Pembroke Pines, Florida. After several years of successfully operating the deli in Pembroke Pines, the family decided to expand by opening a new location in Aventura. Katz Deli of Aventura (“Katz Aventura”) leased a space in the Waterways Plaza of Aventura (“the Plaza”) for that purpose.
The original lease at the Plaza was for a small location — approximately 4,828 square feet — and the deli operated successfully there for approximately two and a half years, with growing revenues in each annual sales cycle. In October of 2001, Katz Aventura formed a new corporation, “Katz Deli Restaurant & Marketplace” (“Katz Deli”), and signed a new lease with the Plaza landlord for a substantially larger space within the Plaza consisting of 15,386 square feet. Katz Deli reopened in the new, larger space in January 2002, which contained a deli and a small Jewish marketplace. Katz Aventura and Katz Deli (collectively “Katz”), though separate entities, were treated as the de facto same company for all relevant purposes of this case.[1]
The initial lease for the new location required monthly rental payments of approximately $25,000, which were to commence in May 2002 and run through April 30, 2007, with built-in 3% annual rent increases. The lease also contained a clause allowing Katz up to three automatic lease renewals for five-year terms by giving six months’ written notice to the landlord, which could potentially extend the lease through April 30, 2022.[2] The lease further *378 required the landlord to make all necessary repairs to the structure and roof. The rental payments set forth in this lease and the automatic renewal periods were well below market value, and were negotiated- by the former non-defendant owner of Waterways Plaza before the defendant, Waterways Plaza, LLC- (“Waterways”), purchased the property.
Waterways purchased the Plaza subject to Katz’s lease, and therefore became Katz’s landlord in June 2002. During its due diligence before purchasing'the Plaza, Waterways commissioned a study of the property, which showed that the roof of Katz Deli was “beyond repair” and needed to be replaced. Waterways did not timely make these roof repairs. Sometime in 2002, Katz’s, roof began to leak. Waterways attempted to make minor repairs to the roof, but, nothing short of a full reroof-ing could have stopped the leaking,. The leaks got progressively worse, eventually resulting in open flows of water into the premises and creating mold and a musty smell throughout the deli.
As a result of the leaks and smell, Katz suffered a substantial decrease in business and its reputation. By May 2003, the location was deemed unfit for use as a restaurant'. Katz Aventura filed suit against Waterways soon thereafter on June 5, 2003, claiming breach of contract and constructive eviction. Katz fully paid its rent through May 2003, and voluntarily placed over $21,000 into the court registry upon filing suit to cover the June. 2003 rent.[3] After Katz moved out of the space at the end of July 2003, Waterways completely reroofed the building and found .new tenants.
The repairs were completed in October 2003. Thereafter, Waterways partitioned the space and had already entered into new leases with two tenants, Sarah’s Tent and China Bistro, for use of the space that had previously been occupied by Katz Deli at a substantially higher rental payment. These new tenants were still in that location and operating successfully at the time of trial despite the higher rental payments. Katz alleges that it was willfully evicted from the premises because Waterways knew that it could take advantage of a new market-rate lease.
Based on Waterways’ actions, Katz brought suit for breach of contract and constructive eviction. Katz also filed a lis pendens for foreclosure of an equitable lien under a provision in’the lease providing that, “Tenant shall look solely and only to the Landlord’s interest in the Plaza in the event of any default or breach.” At the conclusion of a bench trial, the trial court dismissed the equitable lien action, but found that Katz had been constructively evicted due to Waterways’ gross negligence in failing to maintain the roof, and that Waterways had thereby breached the lease agreement.
At a separate hearing on damages, the trial court specifically found that Katz was a successful, ongoing business until the actions by the landlord caused Katz’s business to decline. Katz called an expert accountant, Mr. Druckman, who calculated the projected lost profits resulting from the breach by using various accounting techniques.[4] Waterways, however, argued *379 at the hearing that the market value of the business, not prospective lost profits, was the proper measure of 'damages because the business was completely destroyed. Katz seemingly had not anticipated this argument, and the only evidence proffered as to the market value of Katz Deli was that of the owner, Ron Haibi, who testified that the business’s value was approximately $1.5 million. Haibi’s estimation of the deli’s value was reached by referencing an insurance policy that was taken out for the business and a prior offer to purchase Katz Deli that the Haibis had refused.
The trial court ultimately found that Katz was entitled to future lost profits rather than the market value of the business, and awarded projected lost profits through the end of the initial lease term (April 2007), which totaled approximately $800,000 plus pre-judgment interest, but denied lost profits as to the renewal terms that potentially ran through 2022 because the trial court found that profits for'this period were not reasonably certain. The trial court also denied recovery of various claimed out-of-pocket expenses Katz allegedly incurred due to the eviction, including pending food product purchases, destruction of equipment and inventory, and interest on loans taken out for the business. The trial court further awarded Katz attorney’s fees as the prevailing party under a provision in the lease, but refused, to apply a contingency fee multiplier because it found that a multiplier was not necessary in order for Katz to procure counsel in this case.
On appeal, Katz argues that: (1) it should be awarded the difference in rent between the amount Katz was paying under its favorable lease and the rent payments the new tenants were making plus its lost profits; (2) if lost, profits alone is. the proper method of calculation, it should be awarded lost profits through the end of the renewal periods in 2022; (3) the trial court improperly denied various out-of-pocket expenses caused by the leak; (4) the trial court erred by dismissing its equitable foreclosure and Us pendens;. and (5) Katz should have been awarded a contingency fee multiplier for its attorney’s fees.
Waterways cross-appeals," arguing that lost profits is not the proper method of calculation. Instead, Waterways ' claims that market value at the date of loss is the proper measure of damages, and because insufficient evidence was offered to establish the proper market value of Katz Deli, Katz should be awarded no damages.

DISCUSSION

A constructive eviction constitutes a breach of the covenant of quiet enjoyment. Barton v. Mitchell Co., 507 So.2d 148, 149 (Fla. 4th DCA 1987) (citing Richards v. Dodge, 150 So.2d 477 (Fla. 2d DCA 1968)). Furthermore, Waterways’ grossly negligent failure to repair the roof as required by the lease was a breach of its contract. Barton, 507 So.2d at 149. In an action for breach of contract, the goal is to place the injured party in the position it would have been in had the other party not breached the contract so as -to give the aggrieved party the benefit of its bargain. Lindon v. Dalton Hotel Corp., 49 So.3d 299, 305 (Fla. 5th DCA 2010); Ashland Oil, Inc. v. Pickard, 269 So.2d 714, 723 (Fla. 3d DCA 1972), However, a successful plaintiff “is not entitled to be placed, *380 because of that breach, in a position better than that which he would have occupied had the contract been performed.” Lindon, 49 So.3d at 305 (quoting Madison Fund, Inc. v. Charter Co., 427 F.Supp. 597, 608 (S.D.N.Y.1977) (applying Florida law)).
The injured party may only recover those damages that naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time that the contract was made. It is not necessary that the parties have contemplated the exact injury that occurred as long as the actual consequences “could have reasonably been expected to flow from the breach.”
Lindon, 49 So.3d at 306 (quoting Mnemonics, Inc. v. Max Davis Assocs., Inc., 808 So.2d 1278 (Fla. 5th DCA 2002) (internal citations omitted)).
The damages reasonably flowing from a breach can vary greatly depending on the factual circumstances surrounding the breach, and different methods of calculation may be employed to properly compensate a successful plaintiff. See Pathway Fin. v. Miami Int’l Realty Co., 588 So.2d 1000, 1005 (Fla. 3d DCA 1991) (holding that either reliance damages or expectation damages — lost profits in that context — could be awarded, but not both). Guided by these polestars, we now determine whether the trial court’s damages award was proper in this case.

Whether lost profits was a proper method for calculating damages.

 A trial court’s determination as to the method of calculating damages is reviewed de novo, while findings of fact regarding the amount of damages sufficiently proven are subject to review for clear error. RKR Motors, Inc. v. Associated Unif. Rental & Linen Supply, Inc., 995 So.2d 588, 591 (Fla. 3d DCA 2008); Universal Beverages Holdings, Inc. v. Merkin, 902 So.2d 288, 290 (Fla. 3d DCA 2005). Some cases have held that when a business is totally destroyed, the proper measure of damages is the market value of the business at the date of the loss." See, e.g., City of Key West v. Duck Tours Seaf-ari, Inc., 972 So.2d 901, 902 (Fla. 3d DCA 2007) (“In Florida, ‘[i]f a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss,’ not lost profits.” (quoting Sostchin v. Doll Enters., Inc., 847 So.2d 1123, 1128 n. 6 (Fla. 3d DCA 2003))); Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc., 921 So.2d 43, 46-47 (Fla. 3d DCA 2006). However, “[w]here, as here, a business continues after suffering from an act of negligence the business is entitled to recover the lost profits attributable to defendant’s negligent act, but cannot recover both lost profits, and the market value of the business.” Sostchin, 847 So.2d at 1128 n. 6.[5]
This case presents us with a unique set of facts where the record does not disclose when exactly the negligent act and the breach of the lease occurred. The leaks began sometime in 2002, but the building did not become untenable until May 2003. It is similarly unclear what the “daté of loss” would be under the market value theory of recovery, or what Katz’s market value would be because its market value steadily declined due to the leaks caused by Waterways’ grossly negligent behavior. To compound matters, Katz was not “completely destroyed” when the leaks *381 started, when Waterways breached the lease, or even when Katz turned in its keys and moved out. The record reflects that Katz attempted to reopen but was unable to do so largely because its cash flow was tied up in the Katz Aventura location. Although Katz had ceased doing business, the company itself remained. The company still had inventory on hand and at least some goodwill in the community. There is no bright line for when the business was “completely destroyed,” we simply know that the business never reopened. Awarding market value for a business that has been slowly reduced to nothing due to a defendant’s breach, thereby leaving the plaintiff without an adequate recovery, would be completely inequitable, and is not the law in Florida.[6]
Waterways reached a new lease agreement with the subsequent tenants a mere twenty-six days after Katz moved out, before the roof repairs had even been completed. Waterways reached this new lease agreement very quickly and for substantially higher monthly rental payments. Thus, Katz could not have reopened its business at that location even if it had wanted to do so. Instead, Katz was forced to try to find another suitable location with insufficient capital and with a vastly decreased reputation. The record reflects that most of the company’s (and the family’s) money had been invested in the Aven-tura business and Katz had suffered substantial losses in its business reputation due to the leaky and moldy interior for the last year it was in business in the Plaza. Due to these factors, and others, Katz was not able to reopen at another location.
Under these unique circumstances, we hold that lost profits is a proper measure of damages because Waterways’ long-term continuing breach of the contract allowed Katz to stay in business for a year, but slowly depreciated the market value of that business, thus rendering an award of market value damages insufficient to make Katz whole. As noted above, the primary goal in a breach of contract case is to restore the plaintiff to the position it would have been in had the contract been properly performed. The only remedy that sufficiently restores Katz on these facts is an award of lost profits that have been proven with reasonable certainty.

Whether Lost Profíts Were Sufficiently Proven.

As to whether it was properly established that a budding new business was entitled to lost profits, the Florida Supreme Court has already answered that question in the affirmative. Lost profits are recoverable regardless of how well established a business is so long as there is some “yardstick” by which prospective profits can be measured:
The two seminal Florida cases on recovery of prospective profits are Twyman v. Roell, 123 Fla. 2, 166 So. 216 (1936), and New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co., 122 Fla. 718, 166 So. 866 (1935). In New *382 Amsterdam this Court held that prospective business profits are generally too speculative and dependent on changing circumstances to be recovered. New Amsterdam provided an exception allowing the plaintiff to show the amount of ’ his loss by competent proof. However, this exception only applied to the interruption of an established business. Twyman, ou the other hand, did .not .limit recovery to- established businesses. There, the Court stated that, if there is a “yardstick” by which prospective profits can be measured, they will be allowed if proven. The Court provided further •that the “uncertainty which defeats recovery in such cases” is the cause of the damage rather than the amount. “If from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person.”
We follow the holding in Twyman. A business can recover lost prospective profits regardless of whether it is established or has any “track record.” The party must prove that 1) the defendant’s action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined.
W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So.2d 1348, 1350-51 (Fla.1989) (internal citations omitted).
“Any ‘yardstick’ used to show the amount of profits must be reasonable, and the loss of the profits as a result of the [defendant’s conduct] must be reasonably certain. Lost profits must be established with a reasonable degree.of certainty and must be a natural consequence of the wrong.” Sostchin, 847 So.2d at 1128 (internal citations omitted). The projected profits cannot be mere speculation or conjecture, Stensby v. Effjohn Oy Ab, 806 So.2d 542 (Fla. 3d DCA 2001), but the inability to prove a precise damages amount will not prevent a plaintiff from recovering so long as it is clear that some loss resulting from the defendant’s actions is certain. Ardell v. Milner, 166 So.2d 714, 716 (Fla. 3d DCA 1964).
Katz’s history of success at the Pembroke Pines location, át its former smaller location within the Plaza, and during its short tenure in the larger location prior to the leaks, demonstrate that this was a moderately successful deli that would have continued to yield profits if not for the leaks. The history of sales from these locations, along with the sales projections and unrebutted expert testimony calculating likely prospective profits, provided a sufficient yardstick by which to measure Katz Deli’s prospective profits. As such, the use of lost profits as a measure of damages was proper in this case.

Whether lost profít damages are limited to the term of the initial lease.

“Lost profits must be established with a reasonable degree of certainty and must be a natural consequence of the wrong.” Sostchin, 847 So.2d at 1128. The fact that a party has not yet ex.ercised an automatic renewal provision in a contract does not necessarily preclude it from recovering damages that extend to that portion of a lease. See State Rd. Dep’t v. Tampa Bay Theaters, Inc., 208 So.2d 485, 486-87 (Fla. 2d DCA 1968) (finding that a party holding an option to renew its lease on land being used as a drive-in theater could be compensated for that renewal period in a condemnation proceeding); see also Sostchin, 847 So.2d at 1128 (“The term of the parties’ lease does not define the duration of lost profit damages incurred _”); but see Tolin v. Pearce-Simpson, Inc., 186 So.2d 65, 67 (Fla. 3d DCA 1966) (holding that when a renewal *383 option had not been exercised at the time of breach, “a mere expression at trial of an intention to have exercised the option is not sufficient to extend the lease period”). Rather, the question is whether the renewal of the lease and any profits that would have been realized through the renewal of that lease were reasonably certain. See Tampa Bay Theaters, 208 So.2d at 486-87; Sostchin, 847 So.2d at 1128.
Here, Katz argues it would have renewed its lease through the end of 2022 with reasonable certainty because the deli was operating successfully prior to the water leaks, and because its rent payment was' well below market value. Indeed, Katz points to the subsequent tenants that were still operating in its former space in the Plaza at the time of trial in 2012 as evidence that it would have renewed its lease. Those successor tenants were paying substantially higher rent payments, but nonetheless continued to renew then-leases with Waterways and operate their businesses through the end of the trial period below.[7] Katz also correctly points out that even if its deli and market were struggling, it could have subleased the premises at a substantially higher rent rate and reaped a similar profit that Waterways is now making on the market rental rates.
While this argument. has merit, whether the lease renewal and the lost profits stemming from that renewal were reasonably certain is a quéstion of fact to be determined by the finder of fact. Tampa Bay Theaters, 208 So.2d at 487. “When a cause is tried without a jury, the trial judge’s findings of fact are clothed with a presumption of correctness on appeal, and these findings will not be disturbed unless the appellant can demonstrate that they , are clearly erroneous.” Universal Beverages Holdings, 902 So.2d at 290. The trial court, who is the finder of fact in a bench trial, made a specific finding that an award of lost profits extending past the initial lease term was too speculative. Although we may have found differently on these facts, we cannot say the trial court’s conclusion was clearly erroneous, and therefore we affirm the trial court’s denial of lost profits past the initial lease term.
Whether dismissal of the lis pendens to foreclose on an equitable lien was proper.
In order for a lis pendens to be properly filed, there must be a “nexus between the legal or equitable title to the property and [the plaintiffs] claims below.” Space Dev., Inc. v. Fla. One Constr., Inc., 657 So.2d 24, 24 (Fla. 4th DCA 1995). This nexus requires that the plaintiffs claim could potentially grant some interest in the realty itself before a lis pendens can be maintained. Okur v. Torres, 816 So.2d 1222, 1222 (Fla 3d DCA 2002). In Okur, this Court found that a contract provision nearly identical to the one being asserted in this case does no more than limit the recovery of the tenant against the landlord; it does not provide an interest in the underlying realty. Id. We therefore find no error in the trial court’s dismissal of the equitable foreclosure and lis pendens.

Whether the trial court property denied a contingency fee multiplier.

A trial court’s decision to apply a contingency fee multiplier is reviewed for abuse of discretion. Lane v. Head, 566 So.2d 508, 510-11 (Fla.1990).
*384 “[T]he trial court should consider the following factors in determining whether a multiplier is necessary: (1) whether the relevant market requires a contingency fee multiplier to obtain competent counsel; (2) whether the attorney was able to mitigate the risk of nonpayment in any way; and (3) whether any of the factors set forth in Rowe [8] are applicable, especially, the amount involved, the results obtained, and the type of fee arrangement between the attorney and his client.”
Standard Guar. Ins. Co. v. Quanstrom, 555 So.2d 828, 834 (Fla.1990). One of the most important reasons for imposing a contingency fee multiplier “is to provide access to competent counsel for those who could not otherwise afford it,” to ensure that those parties are able to obtain counsel when it is unlikely that attorneys will take the case for fear of non-recovery. Bell v. U.S.B. Acquisition Co., 734 So.2d 403, 411 (Fla.1999).
In this case, Katz was able to obtain highly skilled counsel, and the evidence shows that any number of attorneys would have agreed to take the case on an hourly or contingent basis. No fee multiplier was necessary to protect Katz’s rights where Waterways’ liability appeared relatively certain. Thus, the trial court’s denial of a fee multiplier was not an abuse of discretion.
Affirmed.[9]

. The trial court erroneously stated in its order that the lease provided for only two five- *378 .year renewal periods, but the lease specifically provides for three renewals.

. The initial lease terms provided for a monthly payment of approximately $25,000, but also granted a $4000 automatic rebate if Katz stayed current on its payments and did not default on the lease in any way.

’. From reviewing the record and examining the parties’ briefs, it appears that Druckman primarily examined Katz Deli’s past sales projections and compared those with actual sales *379 during those periods to find a discount rate for future sales projections. He then applied an additional discount, to account for typical business growth rates, and applied that resulting rate to Katz Deli’s sales projections. It seems that the additional discount also considered the growth and sales of the Aventura area itself, as well as the growth and sales of other restaurants in that area.

. Some cases have held that in a wrongful eviction, the plaintiff is entitled to both lost profits and the difference between the market value of the leasehold and the rent payable, see, e.g., WSG West Palm Beach Dev., LLC v. Blank, 990 So.2d 708, 712 (Fla. 4th DCA 2008), but in this instance, Katz sought recovery for only one or the other because the lost profit calculation inherently included the low monthly rental payments.

. Typically, in "complete destruction of business” cases, the plaintiff chooses to affirmatively prove that its business was completely destroyed because market value of a successful business will often yield a higher recovery than lost profits over a short period of time. Recovering lost profits for a wounded business is typically seen as a secondary method of recovery. See In re Standard Jury Instructions — Contract & Bus. Cases, 116 So.3d 284, 334-335 (Fla.2013) (explaining when jury instructions should be given regarding an award of lost profits versus an award of market value for the business). Here, however, Katz primarily sought lost profits because the market value of the business was so uncertain given the prolonged period of destruction. Record evidence shows that the lost profits ultimately awarded to Katz are very likely less than the market value of the business would have been prior to the leaks.

. Waterways argued in its answer brief that Sarah’s Tent has recently gone out -of business, but this happened after the date of trial.

. In Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla.1985), the Florida Supreme Court instructed that, in calculating reasonable attorney’s fees, trial courts should utilize the criteria from the Florida Code of Professional Responsibility. Specifically, courts should consider:
(1) The time and labor required, the novelty and difficulty of the question involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent. Id. at 1150 holding modified by Standard Guar. Ins. Co. v. Quanstrom, 555 So.2d 828 (Fla.1990).

. The parties also raised several minor points of error not addressed specifically in this opinion. These arguments have no merit.