DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**HCA HEALTH SERVICES OF FLORIDA, INC.** d/b/a **ST. LUCIE MEDICAL CENTER,** a Florida corporation**,**

Appellant,

v.

**CYBERKNIFE CENTER OF THE TREASURE COAST, LLC,** a Florida Limited Liability Company,

Appellee.

No. 4D14-3199

[ June 29, 2016 ]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Martin County; George A. Shahood, Senior Judge; L.T. Case No. 08-852 CA.

Thomas E. Warner, M. Derek Harris, Dean A. Morande and Michael David Sloan of Carlton Fields Jorden Burt, P.A., West Palm Beach, for appellant.

Major B. Harding and Anthony L. Bajoczky, Jr. of Ausley & McMullen, P.A., Tallahassee, and Richard Levenstein and Abby M. Spears of Kramer, Sopko & Levenstein, P.A., Stuart, for appellee.

TAYLOR, J.

Appellant, HCA Health Services of Florida, Inc., d/b/a St. Lucie Medical Center (the "Hospital"), appeals an amended final judgment awarding the plaintiff/appellee, CyberKnife Center of the Treasure Coast, LLC ("CyberKnife"), $1,842,392 in damages for lost revenue on CyberKnife's claim for breach of contract, together with prejudgment interest and costs. We reverse the final judgment, concluding that lost revenue was an improper measure of damages, and appellee offered no proof at trial regarding the correct measure of damages.

In March 2007, CyberKnife and the Hospital entered into the

CyberKnife Services Agreement for a term of five years. Under the Agreement, CyberKnife was required to provide "the Equipment and the Site" to the Hospital for CyberKnife radiosurgery treatments to patients of the Hospital. In exchange, the Hospital would pay CyberKnife $5,150, plus sales tax of $334.75, "per-click" for each treatment rendered to a patient. The site was to be staffed and "operated exclusively by" the Hospital, but CyberKnife was responsible for maintenance of the equipment. The Agreement stated that "in no event shall either party be entitled to consequential or punitive damages."

Before the parties reached a written agreement, they hired an independent expert to perform a fair market valuation ("FMV") of the CyberKnife treatments under the parties' proposed business agreement. The FMV included volume projections and estimates of the number of treatments per patient.

On or about January 25, 2008, the Hospital notified CyberKnife that it was terminating the Agreement. Notably, federal regulations implementing the Stark law[1] later made so-called "per-click" agreements illegal as of October 1, 2009. *See* 42 C.F.R. § 411.357(b)(4)(ii)(B) (2009).

Litigation ensued following the Hospital's termination of the Agreement. At trial, CyberKnife's damages expert testified to his damages calculations under various scenarios. In one scenario, the expert relied upon the original volume projections in the FMV report and opined that CyberKnife's lost revenue was $1,842,392, between January 25, 2008 (when the parties' contract was terminated) and October 1, 2009 (the effective date of the change in the Stark law regulations).

After CyberKnife rested, the Hospital moved for an involuntary dismissal, raising the same arguments it now raises in this appeal. The Hospital renewed its motion for involuntary dismissal at the close of all the evidence. The trial court denied the Hospital's motions for involuntary dismissal and later entered judgment against the Hospital in the amount of $1,842,392 on CyberKnife's claim for breach of contract, plus prejudgment interest and costs.

On appeal, the Hospital's primary arguments concern damages issues. The Hospital argues, as it did below, that the consequential damages waiver in the parties' contract barred the damages CyberKnife

---

[1] The Stark law generally restricts physicians who have a "financial relationship" with a hospital from referring Medicare patients to that hospital, but there are various exceptions. *See generally* 42 U.S.C. § 1395nn.

sought, and that CyberKnife failed to submit any proof on the proper measure of damages, which was lost profits. Although we conclude that CyberKnife's damages were general damages rather than consequential damages,[2] we agree that CyberKnife failed to present evidence of the correct measure of its damages—lost profits.

A trial court's determination as to the *method* of calculating damages is reviewed de novo. *Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, 183 So. 3d 374, 380 (Fla. 3d DCA 2013).

Where a party's repudiation of the contract prevents performance by the non-breaching party, the non-breaching party "may elect between reliance damages (those costs and expenses of preparing to perform, the recovery of which will place the recipient in the position it occupied before entering into the contract) or lost profits (the benefit of the bargain or 'expectation interest')." *Del Monte Fresh Produce Co. v. Net Results, Inc.*, 77 So. 3d 667, 673 (Fla. 3d DCA 2011). Unless the non-breaching party elects reliance damages, "Florida law requires proof of lost profits (income less expense) rather than merely lost gross revenue." *Id.* at 673 n.11. In a lost profits case, the proper computation of damages "requires the non-breaching party to deduct from anticipated contract revenue the costs incurred in performing the contractual services." *Id.* at 674. "Typically these include an appropriate allocation of overhead as well as

---

[2] While case law often refers to lost profits as consequential damages, lost profits do not *always* constitute consequential damages as a matter of law. For example, "[l]ost profits are recoverable as general damages where they flow directly and immediately from the breach of a contract." *Bird Lakes Dev. Corp. v. Meruelo*, 626 So. 2d 234, 238 (Fla. 3d DCA 1993). Indeed, "when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007). Lost profits can constitute general damages where the non-breaching party seeks to recover the total value of the breaching party's promised payments less the cost of performance. *Id.* By contrast, consequential damages do not arise within the scope of the immediate transaction between the parties to a contract, "but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting." *Hardwick Props., Inc. v. Newbern*, 711 So. 2d 35, 40 (Fla. 1st DCA 1998) (citation omitted). Here, although treatments at the CyberKnife facility were provided to third-party patients, the parties' agreement required *the Hospital* to pay per-click each time the equipment was used. Therefore, CyberKnife's lost profits, had they been proven, would have constituted general damages that flowed directly from the parties' immediate transaction.

3

any personnel expenses that would have been incurred." *Id.* Evidence pertaining to loss of income or gross receipts, without specific evidence concerning expenses, is inadequate to prove lost profits. *E.T. Legg & Assocs., Ltd. v. Shamrock Auto Rentals, Inc.*, 386 So. 2d 1273, 1274 (Fla. 3d DCA 1980).

Here, CyberKnife did not present evidence of its reliance damages or its lost profits, but instead merely proved its lost revenue. CyberKnife nevertheless argues that lost revenue was a proper measure of damages in this case because the lost revenue consisted of unpaid rent under a lease agreement. We disagree.

In the landlord-tenant context, a lessor's damages are generally measured by "the difference between the rentals stipulated to be paid and what, in good faith, the landlord is able to recover from a reletting." *Kanter v. Safran*, 99 So. 2d 706, 707 (Fla. 1958) (citations omitted). We find, however, that this measure of damages is inapplicable to the case at bar. Although the CyberKnife Services Agreement has some characteristics of a lease, it is not merely a lease. The Agreement also involved the provision of services. Moreover, because the payment structure was conditioned upon anticipated treatments with third-party patients, there was no stipulated rent under the Agreement, as there would be in a typical lease. In fact, the Agreement does not refer to itself as a "lease" or to the payments thereunder as "rent." Accordingly, we conclude that lost profits, not lost revenue, is the correct measure of expectation damages in this case.

Finally, because there was no proof at trial concerning the correct measure of damages, we reverse and remand for entry of judgment in favor of the Hospital. *See Teca, Inc. v. WM-TAB, Inc.*, 726 So. 2d 828, 830 (Fla. 4th DCA 1999) (where there has been no proof at trial concerning the correct measure of damages, a plaintiff is not entitled to a second opportunity to prove damages and judgment should be entered in favor of the defendant); *see also Morgan Stanley & Co. v. Coleman*, 955 So. 2d 1124, 1131 (Fla. 4th DCA 2007) (same). This disposition renders the remaining issues moot.

*Reversed and Remanded.*

MAY, J., and KEYSER, JANIS BRUSTARES, Associate Judge, concur.

\*　　\*　　\*

**Not final until disposition of timely filed motion for rehearing.**

4