NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

ICMFG & ASSOCIATES, INC., TOM )
COGHLAN, BONNIE Del GROSSO, )
MICHAEL DOYLE, )
)
        Appellants, )
)
v. )   Case No. 2D15-3557
)             2D15-4588
THE BARE BOARD GROUP, INC., )
)   CONSOLIDATED
        Appellee. )
_____ )

Opinion filed March 17, 2017.

Appeal from the Circuit Court for Pinellas
County; Pamela A.M. Campbell, Judge.

Ceci Culpepper Berman and Thomas J.
Seider of Brannock & Humphries,
Tampa; Robert W. Hitchens of Hitchens
& Hitchens, P.A., St. Petersburg, for
Appellants.

Kelly J. Ruoff and Marie Tomassi of
Trenam, Kemker, Scharf, Barkin, Frye,
O'Neill, & Mullis, P.A., St. Petersburg, for
Appellee.

WALLACE, Judge.

        The Appellants, ICMfg and Associates, Inc. (ICM); Tom Coghlan; Bonnie

del Grosso; and Michael Doyle, appeal an Order on Trial and a final judgment entered

in favor of The Bare Board Group, Inc. (BBG), following a bench trial limited to the issue

of damages.  We hold that the trial court did not abuse its discretion in striking the Appellants' pleadings and in entering a default against them as a sanction.  However, we conclude that the trial court erred in ruling that the default previously entered against the Appellants made it unnecessary for BBG to prove a connection between the Appellants' tortious conduct and BBG's claimed lost profits.  Accordingly, we reverse the awards for lost profits, including the prejudgment interest thereon, and remand for a new trial limited to the issue of BBG's claim for lost profits.  We affirm the other damages awards and the awards of attorney's fees and costs.

## I.  THE FACTS AND PROCEDURAL BACKGROUND

### A.  Introduction

BBG is a Florida corporation that was formed in 2002.  It is a supplier of printed computer circuit boards.  At the time of the events pertinent to the underlying litigation, Mr. Coghlan and Ms. del Grosso were both officers, directors, and highly compensated employees of BBG.  Each of them also owned shares of BBG.

Both Mr. Coghlan and Ms. del Grosso were previously acquainted with Mr. Doyle because all three of them were involved in the printed computer circuit board industry.  Mr. Doyle planned to establish a printed computer circuit board business.  Lacking the funds to do so, he approached Mr. Coghlan and Ms. del Grosso for financing.  They both advanced money to Mr. Doyle with knowledge of his plans.  Mr. Doyle incorporated ICM as a Florida corporation in March 2010.

### B.  The Parties' Claims

The litigation in the underlying case began in March 2012 with the filing of a complaint for declaratory judgment by ICM, Mr. Coghlan, and Ms. del Grosso against

BBG. Mr. Coghlan and Ms. del Grosso had resigned as officers, directors, and employees of BBG on January 13, 2012. At the time of their resignations, Mr. Coghlan and Ms. del Grosso each held 11.087% of the outstanding shares of BBG. A shareholder agreement granted BBG the first right of redemption of those shares upon the termination of the employment of Mr. Coghlan and Ms. del Grosso with BBG. In their complaint, ICM, Mr. Coghlan, and Ms. del Grosso alleged that the parties had a dispute regarding the proper value of the shares of stock and that they were in doubt about their rights under the shareholder agreement. They asked the trial court for declaratory relief to resolve the dispute.

BBG answered the complaint and raised various affirmative defenses. In an amended counterclaim, BBG added Mr. Doyle as a counter-defendant[1] and made the following pertinent allegations:

1. BBG is a Florida corporation, in good standing, with its principal place of business in Pinellas County, Florida.

2. ICM is a Florida corporation first established on March 22, 2010[,] with its principal place of business in Pinellas County, Florida.

3. Coghlan and B. del Grosso are each long-time employees and minority shareholders, and officers of BBG, and held positions as directors of BBG for several years.

4. On January 13, 2012, Coghlan and B. del Grosso each unexpectedly announced to BBG his and her resignation as employees of BBG.

---

[1]BBG added two additional counter-defendants to the litigation who were subsequently dropped as parties. For the purposes of this opinion, we need not address the allegations of the amended counterclaim or the course of the litigation pertaining to these parties who were eventually dropped.

5. While holding the position of officer and director of BBG, Coghlan and B. del Grosso each owed fiduciary duties to BBG, to include performing its duties in and for the best interest of the corporation [and] to present all business opportunities which came to their attention to BBG if it involved the present corporate activity of BBG.

6. Coghlan and B. del Grosso, while serving as officers of BBG and as members of its four-person board of directors, knowingly and deliberately undertook a course of conduct, undisclosed to BBG, to divert BBG customers and other BBG customer opportunities to ICM, which is a competitor of BBG and [for] which Coghlan and B. del Grosso were initially named as ICM's officers and directors.

7. Only upon an investigation by BBG after the sudden resignations of Coghlan and B. del Grosso on January 13, 2012[,] were these surreptitious activities of diverted corporate business and opportunities and the existence of ICM discovered by BBG.

8. Doyle is a resident of Pinellas County, Florida, was the initial Vice President of ICM, and has been involved in the same industry as BBG for several years with other entities in Pinellas County, Florida.

. . . .

11. BBG has retained the law firm of Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.[,] to bring suit on their behalf and have agreed to pay a reasonable fee for their services.

12. All conditions precedent to the maintenance and institution of this lawsuit have been performed, have been waived, or have otherwise been satisfied.

In addition, BBG alleged that Mr. Coghlan and Ms. del Grosso had violated their

fiduciary duties to BBG by diverting its customers and business opportunities to ICM

and by generally interfering with BBG's business. BBG alleged further that Mr. Doyle

and Ms. del Grosso and others had aided and abetted the breach of fiduciary duties by

Mr. Coghlan and Ms. del Grosso for the purpose of benefitting ICM's business. BBG

- 4 -

alleged that these activities had caused damages to it, including the loss of its rightful business and profits.

BBG alleged six causes of action in its amended counterclaim as follows: Count I, breach of fiduciary duty (Coghlan and B. del Grosso); Count II, aiding and abetting breach of fiduciary duty (ICM and Doyle); Count III, civil conspiracy to defraud (ICM, Coghlan, B. del Grosso, and Doyle); Count IV, fraud (Coghlan and B. del Grosso); Count V, violation of the Florida Deceptive and Unfair Trade Practices Act, sections 501.201-.213, Florida Statutes (2011) (FDUTPA) (ICM, Coghlan, B. del Grosso, and Doyle); and Count VI, tortious interference with business relationships (ICM, Coghlan, B. del Grosso, and Doyle). The Appellants answered the amended counterclaim and raised various affirmative defenses.

## C. Discovery Abuse, Fraud, and Sanctions

With regard to the claims asserted by BBG in its amended counterclaim, the timing, nature, and extent of the involvement of Mr. Coghlan and Ms. del Grosso with ICM were critical issues. The record supports the conclusion that the Appellants engaged in a concerted effort to interfere with BBG's attempts to discover evidence favorable to BBG on these issues. This effort included the repeated disregard of discovery obligations, noncompliance with court orders to make discovery, false deposition testimony, and the failure to disclose that two of ICM's tax returns had been amended after BBG had requested copies of the returns. The amendments to the two tax returns deleted the names of Mr. Coghlan and Ms. del Grosso from the original returns as two of the shareholders of ICM and listed Mr. Doyle instead as the sole shareholder. Nevertheless, BBG was persistent, and it ultimately obtained copies of the

tell-tale original tax returns through a subpoena duces tecum for deposition directed to ICM's accountant.

After BBG finally obtained copies of the original tax returns, it moved for sanctions against the Appellants. The trial court conducted a hearing on the motion. After the hearing, the trial court entered a lengthy order that outlined the Appellants' derelictions in detail. The trial court then set forth its conclusions of law as follows:

> 18. The Court, having heard argument from counsel and considering its findings of fact under the totality of the circumstances, hereby **GRANTS** BBG's Motion for Sanctions for Counter-Defendants' Destruction of Evidence and Commission of Fraud on the Court.
>
> 19. A deliberate and contumacious disregard of the court's authority will justify the striking of pleadings as will bad faith, willful disregard or gross indifference to an order of the court, or conduct that evinces deliberate callousness. Mercer v. Raine, 443 So. 2d 944, 946 (Fla. 1983); Bailey v. Woodlands Co., Inc., 696 So. 2d 459 (Fla. 1st DCA 1997) (affirming dismissal of party's pleading based on finding a pattern of willful noncompliance or disregard of the rules of civil procedure.)
>
> 20. [Recitation of pertinent factors under Kozel v. Ostendorf, 629 So. 2d 817, 818 (Fla. 1993) omitted.]
>
> 21. Here, Counter-Defendants ICM and Doyle, based on the above findings of fact, have personally engaged in and are responsible for a pattern of willful noncompliance and contumacious disregard of the rules of civil procedure that has prejudiced BBG through undue expense and delay in this litigation. The Court has reviewed the deposition testimony of Doyle and finds him not to be credible in his responses, not complete in his responses, and to have made numerous attempts to mislead the parties in responding to discovery.
>
> 22. A court has a duty and an obligation to strike a party's pleadings if the party commits a fraud during discovery. Long v. Swofford, 805 So. 2d 882, 884 (Fla. 3d DCA 2001).

23. Counter-Defendants have committed fraud in the discovery process by intentionally concealing and then ultimately altering evidence, namely the 2010 and 2011 tax returns, central to the issues in this litigation—Coghlan's and del Grosso's involvement with ICM while officers and directors of BBG. In addition, the Court finds Coghlan's and del Grosso's [deposition] testimony that they were not shareholders in ICM to be untruthful and belied by both the Ownership Email and the original 2010 and 2011 tax returns of ICM that were subsequently altered in order to mislead BBG and this Court as to Coghlan's and del Grosso's ownership interest in ICM. This fraud warrants striking Coghlan's and del Grosso's pleadings.

Based on its findings of fact and conclusions of law, the trial court struck the Appellants' pleadings and entered a default against them on liability with regard to BBG's amended counterclaim.

## D. The Trial Court's Ruling on Causation and Damages

The entry of the order striking the Appellants' pleadings and the entry of a default on liability against them on BBG's amended counterclaim made it unnecessary for BBG to prove liability. But BBG's claims were unliquidated in amount; accordingly, the parties still faced a trial on damages. As the trial on damages approached, the parties had a dispute about whether and to what extent BBG was required to prove a connection between the Appellants' conduct and BBG's claimed lost profits.

At a pretrial hearing, the trial court heard the parties' arguments about the nature of the proof required on BBG's claim for lost profits. BBG argued that causation was an element of liability that had been established by the default. Therefore, BBG reasoned, it need only prove the amount of its damages at trial. In response, the Appellants contended that—despite the entry of the default—BBG was still required to

- 7 -

prove a connection between the Appellant's conduct and the claimed lost profits.  The

trial court agreed with BBG's arguments and ruled as follows:

> THE COURT:  So at this point the Court is finding that the element of causation has already been established.  So we're here for the trial on damages.
>
> [COUNSEL FOR THE APPELLANTS]:  Is counter-plaintiff [the Appellee] required to show a connection between the alleged damages and the bad act?
>
> THE COURT:  I would say that is causation, that nexus is causation.  I think that's been established.
>
> . . . .
>
> But I believe at this point in time, the nexus and the causation are already established.  I think that's my ruling.

This ruling guided the presentation of the evidence at the trial on damages that

followed.

### E.  The Evidence at Trial on Damages

At trial, some of BBG's claims for damages were essentially undisputed.

These claims included the salary and bonuses paid to Mr. Coghlan and Ms. del Grosso

and miscellaneous expenses incurred in connection with BBG's investigation into the

Appellants' conduct.  Here, we are concerned not with these damages but with the

awards for lost profits.

BBG presented its primary evidence on lost profits through the testimony

of its damages expert, a certified public accountant with a specialty in forensic

accounting.  BBG's expert divided the customers for which BBG claimed to have

sustained lost profits into two groups.  The first group included former BBG customers

who had been "diverted" to ICM and to whom ICM had made sales.  This first group

- 8 -

was referred to as the "diverted" group. The second group consisted of BBG customers who were claimed to have had "contact" with Mr. Coghlan, Ms. del Grosso, and a certain salesperson. BBG's expert referred to this group as the "tainted" or "tampered" group. The expert assigned BBG customers to the tampered group even though ICM had not made any sales to them. BBG's expert claimed that sales to customers in the tampered group had declined relative to BBG's remaining customers assigned to a so-called "control" group. The supposed deleterious effect of contact by Mr. Coghlan, Ms. del Grosso, and the designated salesperson on customers assigned to the tampered group was never adequately explained. BBG's expert calculated the lost profits for customers assigned to the diverted group and the tampered group by applying BBG's average profit percentage to sales allegedly lost to BBG. In addition, for each of these two groups, the expert calculated an estimate for BBG's future lost profit on sales for five years into the future.

Notably, BBG's expert freely admitted on cross-examination that he had done nothing to investigate the question of a causal link between the Appellants' conduct and the claimed lost profits. For customers assigned to the tampered group, the question of a connective link was particularly problematic. In this regard, Appellants' counsel asked BBG's expert if he had any information about specific communications purportedly made by Mr. Coghlan, Ms. del Grosso, or the salesperson to these customers. The expert's response is telling: "No. I assumed the causation because that's what I was told to assume. I had heard that there were issues. I was told that there were issues, but it was my understanding that the Court had already made a ruling on the causation."

In other words, BBG's expert testified to the damages claimed for lost profits based on an assumption about causation that he had been asked to make by BBG's counsel. The expert did no more than analyze BBG's financial information in light of the assumptions about a connection between the Appellants' conduct and the claimed lost profits that he had been instructed to make.

At trial, the Appellants offered the testimony of their own expert who questioned the methodology employed by BBG's expert. The Appellants also contended that many of the BBG customers did not belong on either the diverted list or the tampered list for a variety of reasons. Generally speaking, the trial court refused to consider the Appellants' evidence and arguments along these lines based on its prior ruling that causation had been established by the entry of the default on liability.

## F. The Trial Court's Ruling

After the trial on damages, the trial court entered an Order on Trial containing a detailed statement of its findings.[2] Although the trial court had previously entered a default on liability against the Appellants, it specifically found that BBG had proven the elements of each cause of action alleged in its counterclaim. The trial court also accepted the calculation of past and future lost profits offered by BBG's expert on damages.

On Counts I-III and VI of the amended counterclaim, the trial court ruled that BBG was entitled to recover lost profits for customers diverted from BBG to ICM of

---

[2]We commend the trial court for the care that it put into the preparation of the Order on Trial. The detail contained in this order has rendered this court's task of appellate review much easier than it might otherwise have been.

$1,594,927, plus prejudgment interest of $80,440.34. In addition, the trial court ruled that BBG was entitled to future lost profits for customers in the diverted group of $2,311,133.

On Counts I-III and VI of the amended counterclaim, the trial court ruled that BBG was entitled to recover lost profits for customers in the tampered group against the Appellants of $1,734,038, plus prejudgment interest of $200,821.13. In addition, the trial court ruled that BBG was entitled to future lost profits for customers in the tampered group of $3,269,611.

On Counts I, III, IV, and V, the trial court found that BBG was entitled to disgorgement of Mr. Coghlan's salary and bonuses of $721,124, plus prejudgment interest of $122,048.92. Recovery of these amounts was against Mr. Coghlan only.

On Counts I, III, IV, and V, the trial court found that BBG was entitled to disgorgement of Ms. del Grosso's salary and bonuses of $729,550, plus prejudgment interest of $122,864.60.[3] Recovery of these amounts was against Ms. del Grosso only.

On Count V, the trial court found that BBG was entitled to recover additional actual damages from the Appellants of $6374.45, plus prejudgment interest of $605.57. These damages were for miscellaneous expenditures made by BBG to investigate the Appellants' conduct.

Finally, the trial court ruled that BBG was entitled to recover punitive damages against each of the Appellants in an amount to be determined. The trial court also ruled that BBG was entitled to recover its attorney's fees from the Appellants on

---

[3]The amount of prejudgment interest for this award is stated in the final judgment as $122,864.61 instead of $122,864.60.

Count V, its FDUTPA claim, in accordance with section 501.2105.  The trial court reserved jurisdiction to determine the amount of the punitive damages and BBG's reasonable attorney's fees.

### G.  The Final Judgment

After the entry of the Order on Trial, the parties stipulated to an award of $275,000 to BBG for its attorney's fees and costs.  In addition, the parties stipulated that BBG would recover punitive damages of $100,000 against each of the Appellants.  On September 28, 2015, the trial court entered a final judgment in accordance with the Order on Trial and the parties' stipulation concerning attorney's fees and costs and punitive damages.  The total of the judgment against all of the Appellants for damages, prejudgment interest, and attorney's fees and costs is $9,472,950.49.  The trial court entered separate judgments against Mr. Coghlan and Ms. del Grosso for the disgorgement of their salary and bonuses[4] and the $100,000 punitive damages awards. The trial court also entered judgments against ICM and Mr. Doyle for the $100,000 punitive damages awards against them.  The Appellants filed notices of appeal with regard to the Order on Trial and the final judgment.  This court subsequently consolidated the two cases.

## II.  THE APPELLANTS' ARGUMENTS

On appeal, the Appellants argue that the trial court abused its discretion in striking their pleadings and in entering a default judgment on liability against them on

---

[4]The amount of the judgment against Mr. Coghlan for disgorgement of salary and bonuses is $721,124, plus prejudgment interest of $122,048.92.  The amount of the judgment against Ms. del Grosso for disgorgement of salary and bonuses is $729,550, plus prejudgment interest of $122,864.61.

- 12 -

BBG's amended counterclaim. Alternatively, the Appellants argue that multiple errors in the trial court's rulings regarding damages require a new trial on that issue. Finally, the Appellants argue that a reversal of the final judgment requires a reversal of the award for attorney's fees and costs. We will consider these arguments separately below.

## III. DISCUSSION

### A. The Entry of the Default as a Sanction

The conduct for which the trial court sanctioned the Appellants involved repeated and willful violations of discovery obligations and the trial court's orders compelling discovery. However, a reading of the trial court's sanctions order discloses that the trial court determined to impose the ultimate sanction on the Appellants because they had attempted to perpetrate a fraud on BBG and the trial court. The subject of the fraud was pertinent to a critical issue for trial—the involvement of Mr. Coghlan and Ms. del Grosso in the business affairs of ICM. The trial court found that this attempted fraud included but was not limited to discovery abuses. In addition, the trial court found that the Appellants had intentionally concealed and ultimately altered evidence that was central to the issues in the litigation, i.e., ICM's 2010 and 2011 federal income tax returns. The trial court also found that the deposition testimony of Mr. Coghlan and Ms. del Grosso about these issues was contradicted by the contemporaneous documentary evidence of their involvement in the business affairs of ICM. Competent, substantial evidence in the record supports the trial court's findings in this regard.

Our review of a trial court's imposition of sanctions is for abuse of discretion. Distefano v. State Farm Mut. Auto. Ins. Co., 846 So. 2d 572, 574 (Fla. 1st

- 13 -

DCA 2003).  When, as here, the trial court has imposed the ultimate sanction based on fraud, we employ a narrowed abuse of discretion standard of review.  See Jacob v. Henderson, 840 So. 2d 1167, 1168-69 (Fla. 2d DCA 2003).  "A trial court has a duty and an obligation to dismiss a cause of action based upon fraud."  Long v. Swofford, 805 So. 2d 882, 884 (Fla. 3d DCA 2001).  Fraud arises when

> it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense.

Cox v. Burke, 706 So. 2d 43, 46 (Fla. 5th DCA 1998) (quoting Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989)).  We hold that the trial court properly concluded that the Appellants' conduct in this case amounted to such a scheme.

In an attempt to minimize their conduct, the Appellants argue that they must have been poor schemers indeed—they provided BBG with the name of their accountant from whom BBG's attorney obtained the tell-tale documents.  Granted, BBG's attorneys refused to be stymied by the Appellants' evasions and pursued the investigation of the pertinent facts to a successful conclusion.  But the persistence and resourcefulness of BBG's attorneys does not excuse the Appellants' conduct or diminish its seriousness.  We are not persuaded by the Appellants' argument based on the unsuccessful nature of their attempted fraud on the trial court.

Granted, some trial judges might have imposed the lesser sanction of an award of attorney's fees and costs against the Appellants for their conduct.  Nevertheless, even under our narrowed standard of review that is applicable here, we cannot say that no reasonable trial judge would have imposed the ultimate sanction on

the Appellants for their egregious conduct. Accordingly, we find no abuse of discretion here and uphold the trial court's order imposing the ultimate sanction on the Appellants. See Ramey v. Haverty Furniture Cos., Inc., 993 So. 2d 1014, 1020-21 (Fla. 2d DCA 2008) (affirming an order dismissing an action for fraud on the court where the evidence supported the trial court's determination that the plaintiff had provided intentionally false deposition testimony and interrogatory answers concerning his prior medical treatment that were directly related to central issues in the case); Perrine v. Henderson, 85 So. 3d 1210, 1211 (Fla. 5th DCA 2012) (affirming an order dismissing an action for fraud on the court where the plaintiff made numerous material misrepresentations regarding his medical history and current injuries, which were central issues in the case); Babe Elias Builders, Inc. v. Pernick, 765 So. 2d 119, 120-21 (Fla. 3d DCA 2000) (affirming an order striking the defendant's pleadings where the defendant created false invoices to justify amounts charged to the plaintiffs and arranged for the presentation of false deposition testimony that the invoices were accurate).

## B. *The Impact of the Default on the Proof of Lost Profits*

The trial court's ruling on the impact of the entry of the default against the Appellants on the necessity for BBG to establish a connecting link between the Appellants' conduct and the damages for lost profits claimed by BBG is a pure question of law. Accordingly, our review of this issue is de novo. See Kaaa v. Kaaa, 58 So. 3d 867, 869 (Fla. 2010). The question of the methodology employed in calculating damages also involves a question of law that we review de novo. Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC, 183 So. 3d 374, 380 (Fla. 3d DCA 2013); Del Monte Fresh Produce Co. v. Net Results, Inc., 77 So. 3d 667, 673 (Fla. 3d DCA 2011).

Based on the sanctions order entered against the Appellants for the claims asserted by BBG, liability was not an issue at trial. Thus, for example, the Appellants could not dispute the allegations of paragraphs 5 and 6 of BBG's amended counterclaim regarding the breach of their fiduciary duties to BBG and their conduct directed at BBG's customers. They could not raise multiple other defenses that might otherwise have been available to them before the sanctions order was entered. Nevertheless, because BBG's claims for damages were unliquidated in amount, the Appellants had the right to a hearing on damages to contest the amount of damages claimed by BBG. "Florida Rule of Civil Procedure 1.440(c) requires a hearing on claims for unliquidated damages, even if a party has been defaulted." Medcom USA, Inc. v. Ryder Homes & Groves Co., 847 So. 2d 594, 596 (Fla. 2d DCA 2003). "[A] defaulted defendant has the right to contest the amount of unliquidated damages and may offer evidence in mitigation thereof." Talucci v. Matthews, 960 So. 2d 9, 10 (Fla. 4th DCA 2007). Therefore, the entry of the default on liability did not make the Appellants liable as a matter of law for all of the damages claimed by BBG. See id.

Even where, as in this case, the trial is on the issue of damages only and liability is not in question, the claimant remains "obligated to prove some connexity between the damages claimed and [the defendant's tortious conduct]." Rucker v. Garlock, Inc., 672 So. 2d 100, 102 (Fla. 3d DCA 1996); see also Talucci, 960 So. 2d at 10 ("The right to contest unliquidated damages in any negligence action encompasses the right to challenge the causal relationship between the damages claimed and the liability established by the default."); Leal v. Waterproofing Sys. of Miami, Inc., 812 So. 2d 473, 473 (Fla. 3d DCA 2002) (holding that a defendant against whom a directed

verdict on liability had been entered had the right to contest the issue of recovery for diagnostic bills). The requirement to show some "connexity" between the defendant's conduct and the claimant's damages is consistent with the law of damages. In this regard, the Florida Supreme Court has said:

> The fundamental principle of the law of damages is that the person injured by breach of contract or by wrongful or negligent act or omission shall have fair and just compensation commensurate with the loss sustained <u>in consequence of the defendant's act</u> which [gave] rise to the action. In other words, the damages awarded should be equal to and precisely commensurate with the injury sustained.

<u>Hanna v. Martin</u>, 49 So. 2d 585, 587 (Fla. 1950) (emphasis added); <u>see also</u> <u>Glades Oil Co. v. R.A.I. Mgmt., Inc.</u>, 510 So. 2d 1193, 1195 (Fla. 4th DCA 1987) ("In a tort action, the measure of damages is that which is necessary to restore the injured party to the position he would have been in had the wrong not been committed."). Obviously, the limitation of damages awards to those sustained in consequence of the defendant's act precludes awards for losses attributable to other causes.

BBG had the burden of proving its claim for lost profits. <u>See</u> <u>Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. & Assocs., P.A.</u>, 501 So. 2d 107, 109 n.1 (Fla. 3d DCA 1987). "[L]ost profits 'must be proven with a reasonable degree of certainty before [the loss] is recoverable.' " <u>Paul Gottlieb & Co. v. Alps S. Corp.</u>, 985 So. 2d 1, 9 (Fla. 2d DCA 2007) (second alteration in original) (quoting <u>Shadow Lakes, Inc. v. Cudlipp Constr. & Dev. Co.</u>, 658 So. 2d 116, 117 (Fla. 2d DCA 1995)). "The mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture." <u>Id.</u> (quoting <u>Shadow Lakes</u>, 658 So. 2d at 117). "It is fundamental that a lost profit award must be commensurate with what is fair and just

and limited to the actual damages sustained." Pahokee Hous. Auth., Inc. v. S. Fla. Sanitation Co., 478 So. 2d 1107, 1108 (Fla. 4th DCA 1985) (citing Hanna, 49 So. 2d at 587). Where an award of lost profits amounts to an unmerited windfall, it will be set aside. See id.

In light of these principles, we hold that the trial court's pretrial ruling that the default on liability was sufficient to establish "the nexus and causation" between the Appellants' tortious acts and BBG's claim for lost profits was in error. This error prejudiced the Appellants throughout the trial on damages that followed. The trial court accepted the testimony about BBG's claimed lost profits given by its expert. The trial court based its award of damages for lost profits entirely on the expert's testimony. But the expert disclaimed any effort to investigate or to consider a link between the Appellants' conduct and its effect on BBG's business. The expert based his methodology on his "understanding that the Court had already made a ruling on causation." In addition, the trial court's pretrial ruling had a pervasive effect on the rest of the trial because the Appellants were prevented from demonstrating that BBG's claimed business losses were not as great as it claimed or were attributable—in whole or in part—to other causes.

Without conceding that the trial court erred in deciding the "connexity" issue, BBG defends the methodology employed by its expert in determining its claim for lost profits. According to BBG, the methodology employed by its expert ensured that the lost profits calculated for both the diverted group and the tampered group were connected to and the result of the Appellants' tortious conduct. In particular, BBG asserts that its expert's "method of calculating lost profits from the Tampered Group

inherently accounted for other possible lost profits." BBG argues for affirmance of the damages awards for lost profits because—without regard to the trial court's ruling on causation—the methodology employed by its expert was sound.

We reject this argument for three reasons. First, BBG's expert conceded that—in reliance on counsel's instructions—he made no investigation of the facts to determine the existence of a link between the Appellants' conduct and the claimed lost profits. At the very least, the expert's disregard of the issue of causation renders his conclusions about BBG's claimed lost profits suspect.

Second, the expert's methodology with regard to the tampered group is—at the least—questionable.[5] It is unexplained in our record how unspecified "contact" between Mr. Coghlan, Ms. del Grosso, or a salesperson and BBG customers with whom ICM did no business could possibly be linked to sales lost to BBG. Here, the conclusions of BBG's expert about millions of dollars in lost profits appear to be based on nothing more than conjecture and surmise. In this regard, we note that the lost profits claimed for the tampered group are substantially greater than the lost profits claimed for customers to whom ICM actually made sales.

Third, even if one accepts that the testimony of BBG's expert properly linked the Appellants' conduct to the lost profits claimed, a reversal and remand for a new trial on lost profits would still be required. A new trial is necessary because the rulings at trial effectively prevented the Appellants from presenting their defenses that

---

[5]The discussion of the methodology pertinent to the tampered group is by way of example only. A detailed examination of the methodology employed by BBG's expert is beyond the scope of this opinion. Because the issue of BBG's lost profits must be tried again under a correct rule of proof, we will not discuss the testimony of BBG's expert in its entirety.

BBG's losses were not as great as they claimed and that most of the lost profits claimed by BBG were attributable to causes other than their conduct. The trial court's rulings at the trial stymied the Appellants from raising these issues through cross-examination of BBG's witnesses and from the presentation of their own evidence. The trial court also declined to consider the Appellants' arguments about other possible causes of the claimed lost profits.

The entry of the default against the Appellants on the amended counterclaim should not have granted BBG a blank check on which it could insert the numbers it chose untethered to any link to the effects of the Appellants' conduct. On the contrary, BBG's lost profits claim was limited to those damages that it could establish were incurred as a consequence of the Appellants' conduct with reasonable specificity and certainty. The trial court's pretrial ruling and rulings at the trial on causation raised the very real possibility that BBG received an undeserved windfall on its lost profits claim. Because these rulings were in error, we must reverse the awards for lost profits and remand for a new trial limited to that issue.

## C. BBG's Entitlement to Attorney's Fees

The parties stipulated to the reasonable amount of BBG's attorney's fees and costs as $275,000. On appeal, the Appellants argue that a reversal of the judgment for damages necessarily requires reversal of the portion of the judgment representing attorney's fees and costs. See Maynard v. Fla. Bd. of Educ. ex rel. Univ. of S. Fla., 19 So. 3d 347, 347 (Fla. 2d DCA 2009); Wagner v. Uthoff, 868 So. 2d 617, 618-19 (Fla. 2d DCA 2004). Under the law applicable to the award of attorney's fees in this case, we disagree.

The trial court made its award of attorney's fees to BBG under Count V of its amended counterclaim, the FDUTPA claim. BBG's recovery of its FDUTPA claim is not affected by the reversal of the recovery of lost profits. On the contrary, BBG's recovery on the FDUTPA claim included disgorgement of Mr. Coghlan's salary and bonuses, disgorgement of Ms. del Grosso's salary and bonuses, and the recovery of miscellaneous expenses incurred. There was no recovery for lost profits on the FDUTPA claim. The award of attorney's fees on the FDUTPA claim need not be allocated to services specific to that claim:

> [I]n actions containing a deceptive trade practices count and one or more alternative theories of recovery, all based on the same transaction, no allocation of attorney's services need be made except to the extent counsel admits that a portion of the services was totally unrelated to the 501 claim or it is shown that the services related to issues, such as punitive damages, which were clearly beyond the scope of a 501 proceeding.

Heindel v. Southside Chrysler-Plymouth, Inc., 476 So. 2d 266, 272 (Fla. 1st DCA 1985); see also Diamond Aircraft Indus., Inc. v. Horowitch, 107 So. 3d 362, 370-71 (Fla. 2013) (quoting Heindel with approval); Mandel v. Decorator's Mart, Inc. of Deerfield Beach, 965 So. 2d 311, 314 (Fla. 4th DCA 2007) (same). Here, the Appellants have made no claim that the services rendered by BBG's attorneys on the other counts of the amended counterclaim were unrelated to the services rendered on the FDUTPA claim. Because the award of attorney's fees on the FDUTPA claim remains unaffected by the reversal of the damages award for lost profits and no allocation of the attorney's fee award is required, we must affirm the award of attorney's fees and costs.

## IV. CONCLUSION

In summary, we affirm the sanctions order that struck the Appellants' pleadings and entered a default against them on BBG's amended counterclaim. We reverse the Order on Trial and the final judgment to the extent that they awarded lost profits and prejudgment interest thereon to BBG. We remand this case to the trial court for a new trial limited to the issue of BBG's lost profits. We affirm the other damages awards, including those for disgorgement of salaries and bonuses against Mr. Coghlan and Ms. del Grosso and the awards for additional expenses and punitive damages against all of the Appellants. We also affirm the award of attorney's fees and costs.

Affirmed in part, reversed in part, and remanded.

MORRIS and SLEET, JJ., Concur.