# Third District Court of Appeal

## State of Florida

Opinion filed January 29, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D22-1323 & 3D22-2238
Lower Tribunal Nos. 22-4881 & 20-1911
_____

**940 Ocean Drive, LLC,**
Appellant,

vs.

**Sobe USA, LLC,**
Appellee.

Appeals from the Circuit Court for Miami-Dade County, Valerie R. Manno Schurr, Judge.

Dentons US LLP, and Angel A. Cortiñas, for appellant.

Shutts & Bowen LLP, and Ricky L. Polston (Tallahassee), and Steven M. Ebner, and Julissa Rodriguez, and Jamie B. Wasserman; Wolfe Law Miami, P.A., and Richard C. Wolfe; Steinberg & Associates, P.A., and Richard Steinberg, for appellee.

Before LOGUE, C.J., and LINDSEY, and BOKOR, JJ.

LINDSEY, J.

Before us are two appeals that have been consolidated for all purposes, both of which arise from a commercial landlord/tenant dispute. Appellant 940 Ocean Drive (the "Landlord") owns the Breakwater and Edison hotels on South Beach. Appellee Sobe, USA (the "Tenant") operates Ocean's Ten, an outdoor restaurant between the Breakwater and Edison that features live nighttime entertainment. In 3D22-1323, the Landlord appeals from an order dismissing its eviction action as duplicative. In 3D22-2238, the Landlord appeals from a Final Judgment awarding the Tenant $122,698 in compensatory damages for the Landlord's breach of the lease; fees and costs in the amount of $2,163,575.20; and $17,444,738 in punitive damages, plus accruing interest. The Landlord also challenges several interlocutory orders, including an order granting leave to amend to add punitive damages and an order striking the Landlord's pleadings as a sanction for fraud on the court. For the reasons set forth below, we affirm the sanctions order, the order granting leave to amend, and the order dismissing the Landlord's second eviction action, but we reverse the punitive damages award and remand for further proceedings.

## I. BACKGROUND

In January 2020, the Tenant sued the Landlord alleging that "[i]n an effort to constructively evict Tenant (so that Landlord could then rent the premises on better terms), Landlord has undertaken an unlawful practice of

harassment, defamation, tortious interference, all things undertaken in breach of the explicit and implied terms of a lease agreement, to drive Tenant out of business." More specifically, the Tenant alleged that the Landlord had made false noise complaints to the City and had restricted the Tenant's access to parts of the leased premises, including storage, office space, and parking.

In March 2020, the Landlord filed its Answers, Defenses, and Counterclaims alleging, among other things, that the Tenant was in breach of its Conditional Use Permit, County and City noise ordinances, and the Lease due to excessive sound levels. In support of these allegations, the Landlord referenced and attached a February 15, 2020 Notice of Violation issued by the City of Miami Beach's Code Enforcement Office. The Landlord also filed a separate eviction action against the Tenant, which also directly referenced and attached the February 2020 Violation. No other Code Enforcement violations were mentioned or attached in support of the allegations.[1] The two lawsuits were subsequently consolidated.

---

[1] The Landlord also generally alleged that numerous hotel guests had complained about the noise. However, there were no allegations that these guest complaints resulted in a Code Enforcement violation, except for the single February 2020 Violation. Guest complaints, unlike a Code Enforcement violation, do little to support the allegations that the Tenant violated its Conditional Use Permit or municipal noise ordinances.

During discovery, the Tenant requested the Landlord to identify each person who had made noise complaints and to produce all documents related to the complaints. In response, the Landlord produced a spreadsheet with the names of complaining guests, the date of the stays, and the nature of the guests' complaints. Among the listed guests was Anthony Plisko, who, according to the spreadsheet, had stayed a single night in September 2019 and had complained at check out about noise coming from Ocean's Ten. Plisko was also included on the Landlord's expert report on damages as a complaining guest who caused the Landlord to lose revenue. The Landlord did not produce any other documents or information related to Plisko. Salem Mounayyer, the Landlord's general manager, signed the answers to interrogatories and the requests for production under oath.

After approximately nine months of discovery, the Tenant realized, based on Code Enforcement bodycam footage,[2] that several noise complaints, including the one that resulted in the February 2020 Violation, came from Plisko. However, as it later came to be known, Plisko was not actually a paying guest, but a private investigator hired by the Landlord. Based on this information, the Tenant moved to assert a claim for punitive

---

[2] According to counsel for the Tenant, a diligent associate noticed that the same person appeared in multiple Code Enforcement videos complaining about the noise.

damages and to sanction the Landlord for fraud on the court. In its motion, the Tenant included details about three allegedly false complaints in which Plisko encouraged Code Enforcement officers to issue noise citations.

In response, the Landlord denied that its breach claims were based solely on noise complaints from Plisko and attached a table summarizing noise complaints from other guests.[3] The trial court ultimately granted the Tenant's motion to amend to assert claims for punitive damages and deferred ruling on the Tenant's motion for sanctions. The Landlord sought certiorari review of the order granting leave to amend, and this Court denied the petition. See Order Denying Petition for Writ of Certiorari, 940 Ocean Drive, LLC v. SOBE USA, LLC, No. 3D21-1911 (Fla. 3d DCA Feb. 9, 2022).

After being granted leave to amend, the Tenant filed an Amended Complaint, seeking punitive damages for breach of implied covenants of good faith and fair dealing, malicious prosecution, and tortious interference. Up to this point in the proceedings, the Tenant only knew about three of Plisko's complaints to Code Enforcement: (1) September 28, 2019; (2) November 1, 2019; and (3) February 15, 2020. It was Plisko's February 15, 2020 complaint that ultimately resulted in the sole Code Enforcement

---

[3] Most of the items on the table are notices the Landlord itself sent to the Tenant about excessive noise and not Code Enforcement violations. According to the table, the most recent Code Enforcement violation—not including the February 2020 Violation—was in March 2014.

5

violation the Landlord attached in support of its breach claims. At no point did the Landlord disclose in the court below or in the certiorari proceedings before this Court that Plisko had been hired to make noise complaints on more than three occasions.

Further investigation revealed that Mounayyer had hired Plisko at least seven times to make noise complaints to Code Enforcement and that Plisko had submitted written reports to Mounayyer after each visit, which detailed Plisko's attempts to procure a citation. Although the Landlord claimed that Plisko was merely a "secret shopper" or "independent contractor," Plisko's deposition testimony showed that Mounayyer intentionally put Plisko in rooms closest to the sound stage and instructed him to call Code Enforcement after midnight and "get a citation."[4] Based on this additional evidence, the Tenant renewed its motion for sanctions for fraud on the court.

The trial court conducted an evidentiary hearing.[5] Before the hearing, the Tenant submitted 60 exhibits—including declarations, deposition

---

[4] Plisko's initial deposition was continued because he expressed a need to hire counsel. In his continued deposition, he testified several times that his instructions were to get a noise citation.

[5] On appeal, the Landlord asserts that the trial court did not hold an evidentiary hearing. Not so. The hearing was noticed as an evidentiary hearing, and both parties submitted numerous exhibits in advance and agreed to admit many of these exhibits into evidence. Further, at the hearing, both parties expressly recognized that the court was conducting an evidentiary hearing.

6

transcripts, emails and text messages, bodycam footage, Plisko's reports, and various other documents—all without objection and all of which were moved into evidence. At the hearing, the Tenant described Plisko's seven separate complaints to Code Enforcement, all occurring on weekends or holidays, which are briefly outlined below.

- **First Complaint (Saturday, September 28, 2019)**. Guest information from the Landlord's computer system shows that Plisko was intentionally placed in room 216, which is directly above the sound stage. A note from management instructs staff not to move Plisko from the room. Plisko called Code Enforcement to complain about the noise. An officer investigated but did not find any violations and did not issue a citation. After this first stay, Plisko sent Mounayyer a text message asking, "Who is suing who with this breakwater case?"

- **Second Complaint (Saturday, October 19, 2019)**. Plisko again stayed in room 216 and called Code Enforcement to complain about the noise. An officer investigated but did not issue a citation.

- **Third Complaint (Thursday, October 31, 2019 (Halloween))**. Plisko checked into room 215, which is also directly above the sound stage. According to Plisko's written report to Mounayyer, he "noticed there were soundproof windows in the room and cracked one of them slightly open but unnoticeable, which made the music much louder." Plisko then called

7

Code Enforcement. Plisko's report further states that the officer did not notice that the window was cracked. At Plisko's request and encouragement, a citation was issued. This citation was later reversed and dismissed by a Special Magistrate.

- **Fourth Complaint (Saturday, November 2, 2019)**. Plisko stayed in room 216 and called Code Enforcement. An officer investigated but did not issue a citation.

- **Fifth Complaint (Friday, November 15, 2019)**. Plisko stayed in room 216 and called Code Enforcement. According to Plisko's report, "[t]he window was cracked open in an unnoticeable fashion so when the officer arrived [it] would be louder than normal." Despite the open window, no citation was issued.

- **Sixth Complaint (Friday, February 14, 2020 (Valentine's Day))**.[6] Plisko stayed in room 216 and called Code Enforcement. Plisko again encouraged the officer to issue a citation. After an investigation, no citation was issued.

- **Seventh Complaint (Saturday, February 15, 2020)**. Plisko stayed in the same room as the night before and again called Code Enforcement.

---

[6] Plisko's sixth and seventh stays occurred after the Tenant filed its action against the Landlord.

According to his report, "the one window was still open from the night before." Following an investigation, no noise citation was issued.

Plisko's February 15, 2020 complaint to Code Enforcement did not result in a citation. But Mounayyer, dissatisfied with this result, emailed the Mayor, City Manager, and Director of Code Compliance asking them to issue a citation based on upset and unhappy "guests" who were unable to sleep. At his deposition, Mounayyer admitted he was only referring to one "guest"— Plisko. The Director of Code Compliance emailed back stating, "I thought maybe we had turned the corner on this because if I recollect, it[']s been quite some time since we received a loud music complaint at your hotel." The City ultimately issued a Notice of Violation,[7] which became the sole violation the Landlord relied on and attached in its Counterclaim and Eviction Complaint.

Following the evidentiary hearing, the trial court rendered a detailed, 49-page order granting the Tenant's Motion for Sanctions. The court dismissed the Landlord's Counterclaims and consolidated eviction action and defaulted the Landlord on all the Tenant's claims as a sanction for fraud

---

[7] The Tenant challenged this violation before a Special Master, and the citation was dismissed. The Landlord appealed but ultimately dismissed the appeal. At no point during these proceedings did the Landlord disclose that Mounayyer had hired Plisko.

9

on the court. This resulted in an automatic liability determination on all the Tenant's claims, leaving only the issue of damages.

The sanctions order also addressed rent held in the court registry and specified that disbursement would not be determined until the court decided damages and fees. Despite the trial court's ruling on rent disbursement, the Landlord filed several motions to disburse the funds, all of which were denied. Moreover, after the Landlord's initial consolidated eviction action was dismissed for fraud on the court, the Landlord filed a new eviction action based on nonpayment of rent. In June 2022, the trial court dismissed this second eviction action, concluding that the Landlord's new eviction action was duplicative. The Landlord timely appealed the dismissal of its second eviction action (3D22-1323).

As for the main action, the court held a three-day bench trial on damages and fees in September 2022. In November 2022, the court rendered a 36-page Final Judgment against the Landlord, incorporating the 49-page sanctions order. The court awarded the Tenant $122,698 for the Landlord's failure to provide office, storage, and parking space. The order also required the Landlord to immediately provide the office, storage, and parking space. The order further awarded the Tenant $2,163,575.20 in attorneys' fees and costs. Finally, the order awarded the Tenant $17,444,738 in punitive damages. Following the denial of its post-judgment

motions for rehearing and remittitur, the Landlord timely appealed (3D22-2238).

## II.   ANALYSIS

The Landlord raises several arguments on appeal, which fall into three primary challenges: (1) the sanctions order, (2) punitive damages, and (3) the order dismissing the Landlord's second eviction action.   We address each challenge in turn.

### A. The Sanctions Order

This Court has long held that striking a party's pleadings is an available and often favored remedy for a party's misconduct in the litigation process.[8] Empire World Towers, LLC v. CDR Creances, S.A.S., 89 So. 3d 1034, 1038 (Fla. 3d DCA 2012).   This is because "a party who has been guilty of fraud or misconduct in the prosecution or defense of a civil proceeding should not be permitted to continue to employ the very institution it has subverted to achieve her ends."   Bertrand v. Belhomme, 892 So. 2d 1150, 1152 (Fla. 3d DCA 2005) (quoting Metro. Dade County v. Martinsen, 736 So. 2d 794, 795 (Fla. 3d DCA 1999)).

---

[8] The misconduct here was primarily alleged to be that of the Landlord.  We therefore reject the Landlord's argument that the trial court was required to consider the factors set forth in Kozel v. Ostendorf, 629 So. 2d 817, 818 (Fla. 1993), which apply "in those situations where the attorney, and not the client, is responsible for the error."

11

We review an order dismissing or striking pleadings for fraud on the court under the "narrowed" abuse of discretion standard. Oracle Elevator Co. v. 8660 Bldg., LLC, 353 So. 3d 689, 693 (Fla. 3d DCA 2023). "This standard of review takes into account 'the heightened clear-and-convincing-evidence standard regarding . . . allegations of fraud.' For the trial court to properly exercise its discretion regarding dismissal of a case for fraud on the court, 'it must have an evidentiary basis to make that decision.'" Ramey v. Haverty Furniture Cos., 993 So. 2d 1014, 1018 (Fla. 2d DCA 2008) (quoting Howard v. Risch, 959 So. 2d 308, 312 (Fla. 2d DCA 2007)).

Even under this narrowed standard, we cannot conclude that the trial court abused its discretion. Its detailed, 49-page sanctions order is supported by ample record evidence.[9] For instance, Plisko's deposition testimony and his written reports, which were admitted into evidence without objection, show that he was not merely a secret shopper, as the Landlord contends. In fact, Plisko was paid by the Landlord to cause a Code Enforcement citation to be issued. The Landlord intentionally placed him in the noisiest rooms in the hotel on weekends and holidays and specifically instructed him to get Code Enforcement into the room to issue a noise citation. Indeed, bodycam footage revealed that Plisko often lied to the

---

[9] We note that the record in these consolidated appeals totals over 30,000 pages.

12

officers by telling them he had never been to Ocean Drive and was unaware of its reputation, that he had paid hundreds of dollars per night and expected to get some rest, and that he and his wife could not sleep. In reality, Plisko was unquestionably aware of Ocean Drive's reputation; he did not pay, and instead was paid to stay at the hotel; he never spent the night in the room; and his wife was never with him. Plisko's reports also indicate he cracked open the soundproof windows in an unnoticeable way so that more sound would enter the room.

Although the Landlord later amended its Complaint to reference specific noise complaints from other guests, none of these complaints resulted in the sole Code Enforcement noise violation issued within the past several years. Finally, the Landlord failed to disclose anything having to do with Plisko, other than that he was a "guest" who had stayed a single night in September 2019. Were it not for the Tenant's diligence, the Landlord's scheme never would have been discovered.

The Landlord contends that the alleged fraudulent conduct did not occur in these proceedings but instead before the case was filed. The record evidence shows otherwise. Text messages between Plisko and the Landlord after Plisko's first stay at the hotel show that Plisko was aware of the impending lawsuit. Further, two of Plisko's stays, including the stay that resulted in the February 2020 Violation, occurred after the Tenant filed its

13

action against the Landlord. Indeed, the Landlord relied on this very Violation in support of its counterclaims and its consolidated eviction action. Moreover, the Landlord failed to disclose Plisko's involvement during extensive discovery. And even after the Tenant discovered three of Plisko's complaints, the Landlord failed to fully disclose the extent of Plisko's involvement below and in the certiorari proceedings before this Court.

Given the record, the detailed sanctions order, and our deferential standard of review, we are compelled to affirm the sanctions order.

**B. Punitive Damages**

Our analysis of punitive damages is governed by Part II of Chapter 768, Florida Statutes. Because we are presented with pure issues of law having to do with statutory interpretation, our standard of review is de novo. See, e.g., Coates v. R.J. Reynolds Tobacco Co., 375 So. 3d 168, 171 (Fla. 2023).

As an initial matter, the Landlord contends that the trial court erred in allowing the Tenant to allege claims for punitive damages. We disagree and affirm, without further discussion, the order granting the Tenant's motion for leave to amend to assert punitive damages because the Tenant made a reasonable showing by extensive proffer that provided a reasonable basis for recovery of punitive damages. See § 768.72(1), Fla. Stat. (2024) ("In any civil action, no claim for punitive damages shall be permitted unless there is

14

a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages."); Gattorno v. Souto, 390 So. 3d 134, 137 (Fla. 3d DCA 2024) ("[T]his court 'views the record evidence and the proffered evidence in the light most favorable to the plaintiffs and accepts said evidence as true for the purpose of reviewing whether a reasonable basis exists for punitive damages.'").

We turn now to the Landlord's argument that the trial court erred in awarding over $17 million in punitive damages. The Landlord contends that the trial court was, as a matter of law, precluded from awarding punitive damages because the Tenant did not present any evidence establishing its entitlement to punitive damages. We agree.

At the outset, we recognize the unusual procedural posture in this case. This is because a default was entered against the Landlord for fraud on the court, which the trial court determined automatically established punitive damages liability. As set forth in the Final Judgment, "[t]he allegations asserted in the Amended Complaint . . . have been admitted and established as true as a result of the default entered against Landlord . . . ." Consequently, the Tenant was never required to prove entitlement to punitive damages, and the bench trial below only addressed the amount of damages.

15

We conclude that this runs counter to the text of the governing statute. "In interpreting the statute, we follow the 'supremacy-of-text principle'—namely, the principle that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" Ham v. Portfolio Recovery Assocs., LLC, 308 So. 3d 942, 946 (Fla. 2020) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012)).

Section 768.725, Florida Statutes (2024), governs the plaintiff's burdens of proof in a punitive damages action:

> In all civil actions, **the plaintiff must establish at trial, by clear and convincing evidence, its entitlement to an award of punitive damages**. The "greater weight of the evidence" burden of proof applies to a determination of the amount of damages.

(Emphasis added). This language, which applies in all civil actions, establishes a mandatory burden on the plaintiff to establish entitlement to punitive damages by clear and convincing evidence. This requirement was not satisfied below.

The Tenant points to three cases in which entitlement to punitive damages was automatically determined following a default. See Far Out Music, Inc. v. Jordan, 502 So. 2d 523 (Fla. 3d DCA 1987); Lawson v. Latham, 564 So. 2d 1216 (Fla. 3d DCA 1990); and ICMfg & Assocs., Inc. v. Bare Bd. Grp., Inc., 238 So. 3d 326 (Fla. 2d DCA 2017). However, none of these

16

cases discusses section 768.725. Indeed, two of the cases were decided before 1999, which is when the statute was enacted. See Ch. 99-225, § 21, Laws of Fla. Moreover, in ICMfg, which was decided after section 768.725's enactment but does not contain discussion of any provision in Chapter 768, the trial court found that despite the default, the counter-plaintiff had proven entitlement to punitive damages. 238 So. 3d at 332 ("Although the trial court had previously entered a default on liability against the Appellants, it specifically found that [the counter-plaintiff] had proven the elements of each cause of action alleged in its counterclaim.").

Because section 768.725 requires the Tenant to "establish at trial, by clear and convincing evidence, its entitlement to an award of punitive damages[,]" we reverse the punitive damages award and remand for a trial on entitlement.

### C. Dismissal of the Landlord's Second Eviction Action

The order striking the Landlord's second eviction action is reviewed under the abuse of discretion standard. See Belson v. Miller, 314 So. 3d 525, 527 (Fla. 3d DCA 2020).

In August 2020, the trial court entered an order requiring the Tenant to deposit rent into the court registry. During the course of litigation, the Landlord repeatedly, but unsuccessfully, sought to circumvent the trial court's order by filing six separate motions for disbursement of rent. In its

order sanctioning the Landlord for fraud on the court, the trial court ruled that the issue of rent would not be determined until after the court decided the issue of damages.

Despite these orders, in March 2022, the Landlord filed a new eviction action seeking rent from the Tenant after the Landlord's initial eviction action was dismissed as a sanction for fraud on the court. The Tenant moved to dismiss the second eviction action, arguing that it was a bad faith, improper, and duplicative lawsuit in violation of the court's orders governing rent payments. The trial court agreed, concluding as follows:

> Landlord's duplicative and improper lawsuits are inappropriate, especially when the Instant Action is nothing more than a transparent attempt to avoid the fact that its pleadings have already been stricken with prejudice for committing fraud upon the Court. . . . As a result, Landlord's claims are precluded and Landlord cannot now relitigate the same issues on which it has been sanctioned and defaulted by initiating a new lawsuit.

> The Consolidated Case encompassed the disputes between the parties and Landlord's current issues are the very same as those it previously raised and/or was required to raise in the prior action. Landlord's attempt to pretend like the Consolidated Case and the Sanctions Order never happened is highly inappropriate and is precluded by law . . . .

> In addition, the Court issued three separate orders- the Rent Order, the Sanctions Order, and the

18

Agreed Rent Order[10]-all of which concern the deposit, timing and/or availability of [Tenant's] rent payments. If Landlord had any issue with any of the aforementioned Orders, it could have attempted to appeal those Orders or re-address them in the Consolidated Case. However, Landlord cannot simply ignore this Court's Orders, as if they do not exist, and file a new action seeking the very same rent. Landlord has clearly and knowingly initiated the Instant Action in direct violation of this Court's Orders. Therefore, not only does Landlord have no legal basis to bring the Instant Action, but it has also knowingly initiated the Instant Action on the basis of false allegations and bad faith.

(Citations omitted).

Based on the record before us, the trial court did not abuse its discretion. We therefore affirm the order dismissing the Landlord's second eviction action as duplicative.

## III. CONCLUSION

Accordingly, for the foregoing reasons, we affirm the sanctions order, the order granting leave to amend, and the order dismissing the Landlord's second eviction action. But we reverse the punitive damages award and remand for further proceedings.

Affirmed, in part; reversed, in part.

---

[10] In May 2022, the parties agreed to an order providing that the trial court would not consider releasing any money in the registry until after a hearing on the amount of attorney's fees and costs.

19